**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF ALASKA, Office of the
Governor,
                            *Petitioner,*

                v.

EEOC; UNITED STATES OF
AMERICA,
                            *Respondents,*

MARGARET G. WARD,
                            *Intervenor.*

No. 07-70174

Agency Nos.
11A40004 &
11A40005

OPINION

On Petition for Review of an Order of the
Equal Employment Opportunity Commission

Argued and Submitted
September 24, 2008—San Francisco, California

Filed May 1, 2009

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Diarmuid F. O'Scannlain, Sidney R. Thomas,
Barry G. Silverman, Kim McLane Wardlaw,
Marsha S. Berzon, Richard C. Tallman,
Consuelo M. Callahan, Milan D. Smith, Jr. and
Sandra S. Ikuta, Circuit Judges.

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain;
Dissent by Judge Ikuta

**COUNSEL**

Brenda B. Page, Deputy State Attorney General for the State of Alaska, Anchorage, Alaska, for the petitioner.

Nelson Cohen, United States Attorney, Anchorage, Alaska, Ronald Cooper, Office of General Counsel, Washington, DC, Stephen Llewellyn, Equal Employment Opportunity Commission, Washington, DC, Stephanie R. Marcus, Department of Justice, Washington, DC, and Paul D. Ramshaw, Equal Employment Opportunity Commission, Washington, DC, for the respondents the Equal Employment Opportunity Commission.

Marleigh Dover, Department of Justice, Washington, DC, for the respondents the United States.

Lee Holen, Anchorage, Alaska, and Samuel R. Bagenstos, St. Louis, Missouri, for the intervenor.

**OPINION**

KOZINSKI, Chief Judge:

We must decide whether states have Eleventh Amendment immunity from claims under the Government Employee Rights Act of 1991 (GERA).

**Facts**

Lydia Jones and Margaret Ward worked in the office of then-Governor Walter Hickel of Alaska. Both were fired

under disputed circumstances and filed complaints with the Equal Employment Opportunity Commission. Jones alleged that she was paid less because she is a black woman, sexually harassed and then retaliated against for complaining about the harassment. Ward alleged that she was paid less on account of her sex and that she was terminated because of statements she made supporting Jones's complaint.

The EEOC assigned the cases to an administrative law judge. Before the ALJ, Alaska argued that Jones and Ward's claims were barred by sovereign immunity. The ALJ disagreed. On interlocutory appeal, the EEOC denied the sovereign immunity defense and remanded for further proceedings. The state petitions for review of the EEOC's decision.[1]

## Analysis

**[1]** The Eleventh Amendment protects states from being sued without their consent. This immunity applies by its terms to the judicial power, but the Supreme Court has held that

---

[1]A remand order is not a final agency decision, and so would not normally fall within our jurisdiction. Because this remand order turns on a claim of sovereign immunity, however, a version of the collateral order doctrine provides a basis for our jurisdiction here. *See Cohen* v. *Beneficial Loan Corp.*, 337 U.S. 541, 546 (1949); *P.R. Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) ("States . . . may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity."). Although the collateral order doctrine is understood as a "construction" of 28 U.S.C. § 1291, *Digital Equipment Corp.* v. *Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (internal citation omitted), it is also applicable by analogy in the context of non-final agency determinations that meet the standards articulated in *Cohen. See, e.g.*, *Fed. Trade Comm'n* v. *Standard Oil Co. of Cal.*, 449 U.S. 229, 246 (1980); *Meredith* v. *Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1050 (D.C. Cir. 1999). Because the EEOC's remand order turns on Alaska's claim of sovereign immunity, and because it otherwise meets *Cohen*'s requirements—it is "conclusive . . . [and] resolve[s an] important question[ ] completely separate from the merits . . . [that would be] effectively unreviewable on appeal from final judgment in the underlying action," *Digital*, 511 U.S. at 867—we may review it.

some administrative proceedings sufficiently resemble civil actions to be circumscribed as well. *Fed. Mar. Comm'n* v. *S.C. State Ports Auth.*, 535 U.S. 743, 760-61 (2002). The contours of that principle aren't completely clear, but the parties seem to agree that EEOC proceedings are sufficiently court-like to implicate the Eleventh Amendment. We assume, without deciding, that this is true.[2]

**[2]** Congress may abrogate this immunity in certain circumstances. To determine when it has validly done so, we must "resolve two predicate questions: . . . whether Congress unequivocally expressed its intent to abrogate" and, if so, "whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel* v. *Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000).

**[3] 1.** Congress's intent to abrogate sovereign immunity in the Government Employee Rights Act is both "unequivocal and textual." *Dellmuth* v. *Muth*, 491 U.S. 223, 230 (1989); *see also Atascadero* v. *Scanlon*, 473 U.S. 234, 242 (1985). As its title suggests, the statute is designed to give rights to government employees, including state employees, against their employers. The act amended Title VII to extend coverage of its employment discrimination provisions to such government employees: "[A]ny individual chosen or appointed, by a person elected to public office in any State . . . to be a member of the elected official's personal staff," as Jones and Ward were, has rights under GERA to a workplace "free from any discrimination based on . . . race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-16c(a)(1), 2000e-16b(a)(1). GERA authorizes the EEOC to order remedies for

---

[2]We have independently determined that this assumption is plausible. State government employees who file a claim with the EEOC are subject to procedures that are quite different from those applicable to claims against private employers. *Compare* 29 C.F.R. Part 1603 *with* 29 C.F.R. Part 1601. The latter procedures are similar to mediation, whereas the former are adjudicative, much like those in *Federal Maritime Commission*.

violations of these rights, 42 U.S.C. § 2000e-16c(b)(1), including "back pay (payable *by the employer* . . . responsible for the unlawful employment practice)." 42 U.S.C. § 2000e-16b(b)(1), cross-referencing 42 U.S.C. § 2000e-5(g) (emphasis added).

**[4]** A "general authorization for suit in federal court" is an insufficient expression of congressional intent to abrogate state sovereign immunity, *Atascadero*, 473 U.S. at 246, as are inferences from legislative history and statutory purpose, *Dellmuth*, 491 U.S. at 230, 232. But *Dellmuth* and *Atascadero* "do[ ] not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment." *Dellmuth*, 491 U.S. at 233 (Scalia, J. concurring).[3] GERA's text makes congressional intent to abrogate state sovereign immunity "unmistakably clear." *Atascadero*, 473 U.S. at 242. GERA expressly covers state employees, and expressly gives them a right to collect damages "payable *by the employer*"— the state. 42 U.S.C. § 2000e-5(g)(1) (emphasis added).

**[5]** The only way Congress could have been clearer would have been to say "this act abrogates state sovereign immunity." But the Supreme Court has made it quite plain that such magic words are unnecessary. Twice it has considered statutes with provisions like GERA's—giving employees a cause of action for damages, and separately providing that state employers will pay—and twice it concluded that the statutes adequately expressed Congress's intent to abrogate state sovereign immunity, even though neither statute includes the terms "abrogate," "state sovereign immunity" or "Eleventh Amendment." *Kimel* v. *Florida Board of Regents*, 528 U.S. 62 (2000), considered the Age Discrimination in Employment

---

[3]As the fifth vote in the majority, Justice Scalia's view as to the meaning of the Court's opinion (as expressed in his concurrence) is entitled to substantial, if not controlling, weight.

Act (ADEA). One section of the ADEA incorporates an enforcement provision from a separate statute, the Fair Labor Standards Act (FLSA), "authoriz[ing] employees to maintain actions for backpay 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction.' " 528 U.S. at 67-68, 73-74 (quoting 29 U.S.C. § 216(b), as cross-referenced in 29 U.S.C. § 626(b)). A separate section of the FLSA defines "public agency" to include "the government of a State or political subdivision thereof." *Id.* at 74 (quoting 29 U.S.C. § 203(x)). The Court held that "[r]ead as a whole, the plain language of these provisions clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of individual employees," *id.* at 74, explaining that "our cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time," *id.* at 76.

**[6]** *Nevada Department of Human Resources* v. *Hibbs*, 538 U.S. 721 (2003), likewise held that provisions of the Family and Medical Leave Act (FMLA) unequivocally expressed Congress's intent to abrogate state sovereign immunity. Like the ADEA, the FMLA authorizes suits against employers, and incorporates a definition of employers that includes public agencies, and a definition of public agencies that includes states, but doesn't refer to state sovereign immunity or the Eleventh Amendment. GERA is cut from the same cloth as the ADEA and the FMLA; its reference to states as potential defendants who must answer in damages is as clear, and its focus on government employers sharper, than in these two other statutes. GERA's provisions, entitling state employees to "back pay . . . payable by the employer," 42 U.S.C. §§ 2000e-5(g)(1), 2000e-16c, unmistakably express Congress's intent to allow suits against states for damages. As in *Kimel* and *Hibbs*, "[t]he clarity of Congress' intent here is not fairly debatable." *Hibbs*, 538 U.S. at 726. The remaining question, to which we now turn, is whether Congress had the authority to do what it intended.

[7] **2.** Section 5 of the Fourteenth Amendment empowers Congress to "enforce, by appropriate legislation, the provisions of" that article, and state sovereign immunity may be abrogated in service of this goal. There are two ways in which Congress can do this. First, Congress may prohibit and provide a remedy for conduct that actually violates the Amendment. *E.g.*, *United States* v. *Georgia*, 546 U.S. 151, 158 (2006) (upholding a prohibition against cruel and unusual treatment of prisoners). Second, legislation "which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne* v. *Flores*, 521 U.S. 507, 518 (1997). We refer to the latter kind of legislation as prophylactic, and it must satisfy certain strict requirements designed to ensure that Congress doesn't substantively redefine the Fourteenth Amendment's guarantees. Before we can uphold prophylactic legislation, we must be convinced that it is congruent and proportional to the harm that Congress sought to prevent, and we often examine legislative findings as part of that inquiry. *Id.* at 520. But the congruence and proportionality requirement applies only to prophylactic legislation; it doesn't apply to a direct remedy for unconstitutional conduct.

[8] We therefore consider first whether Jones and Ward allege actual violations of the Fourteenth Amendment by the State of Alaska. If they do, we needn't decide whether GERA is valid prophylactic legislation. As *Georgia* indicates by its method, *see* 546 U.S. at 158-60, when legislation provides a direct remedy for unconstitutional conduct, the *Boerne* inquiry is superfluous. The merits of these claims (and Alaska's various defenses) aren't before us; we consider only whether each claim alleges conduct that, if it occurred and wasn't justified by a valid defense, would have violated the Fourteenth Amendment.

[9] **a.** This inquiry is straightforward for Jones and Ward's pay discrimination claims. Jones alleges that she was "paid

less than [her] male counterparts" by the Governor's Office, and that "this was intentionally imposed due to [her] sex, female and [her] race, black." Ward alleges that the Governor "treated [her] differently than [her] counterparts due to [her] sex, female," specifically by paying her less than a male counterpart. Intentional race discrimination violates equal protection unless narrowly tailored to serve a compelling state interest. *See Washington* v. *Davis*, 426 U.S. 229, 239 (1976). Disparate treatment on the basis of sex requires an "exceedingly persuasive justification." *Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 724 (1982). The state has claimed no such interest or justification, and we'd be hard-pressed to figure out what it might be. The alleged pay discrimination, if it happened, denied Jones and Ward equal protection of the law.

**b.** We next consider Jones's allegations of workplace harassment. She alleges that she was "the butt of sexual jokes" and "unsolicited physical contact." According to her complaint, one of the Governor's top deputies approached her from behind and placed his hand between her legs and, on a separate occasion, approached her as if to grab her breasts. Jones further alleges that she was retaliated against "for filing a . . . complaint of sexual h[a]rassment."

**[10]** While the Supreme Court hasn't specifically considered whether sexual harassment of a governmental employee can violate the Equal Protection Clause, several of our sister circuits have concluded that it can, and we agree. *See, e.g.*, *Southard* v. *Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[S]exual harassment in public employment violate[s] the Equal Protection Clause of the Fourteenth Amendment.") (collecting cases); *Andrews* v. *City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (sustaining section 1983 liability for sexual harassment); *Bohen* v. *City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986) ("[S]exual harassment by a state employer . . . constitutes sex discrimination in violation of the equal protection clause.").

Because the suit is against Alaska, not the man who allegedly harassed Jones, we must consider whether Jones alleged that the state violated her Equal Protection rights. Jones cannot make such an allegation under a theory of respondeat superior; she must allege that Alaska has intentionally discriminated against her. *Davis*, 426 U.S. at 239; *see also Andrews*, 895 F.2d at 1480. While Jones has not alleged that the Governor's Office intentionally discriminated against her through an official policy promoting sexual harassment, the office may nevertheless have violated the Equal Protection Clause by intentionally refusing to redress the sexual harassment of Jones by another employee.[4] *See Bohen*, 799 F.2d at 1187 (holding that a government employee can make "a claim of sexual harassment under the equal protection clause" by "showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination").

**[11]** Jones alleges that she reported the sexual harassment, and that the Governor's Office responded by punishing her, rather than disciplining her harasser. This alleged conduct, if true, would constitute intentional sexual discrimination by the state. Jones need not allege that other state employees were harassed as well, or that the Governor's Office routinely failed to respond to such harassment, to make out an Equal Protection claim. *Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 n.14 (1977); *Bohen*, 799 F.2d at 1186-87 ("[A] single discriminatory act against one individual can amount to intentional discrimination for equal protection purposes. An equal protection plaintiff therefore need not prove a discriminatory policy against an entire class; discrimi-

---

[4]We need not and do not decide whether other types of sexual harassment claims brought against governmental entities under Title VII or GERA also state violations of the Equal Protection Clause. *See Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998) (discussing types of sexual harassment claims that can be brought against employers under Title VII); O'Scannlain concurrence at 5078-80.

nation against the plaintiff because of her membership in the class is by itself enough.") (citations omitted).

**[12] c.** Finally, we consider Ward's claim of retaliatory discharge. Unlike the pay disparity and sexual harassment claims, this claim doesn't allege differential treatment because of race or sex. Rather, Ward complains that she was punished for speaking up about the harassment of Jones. The Fourteenth Amendment's Due Process Clause incorporates the First Amendment's free speech guarantees, so if Ward has alleged conduct that would violate the First Amendment,[5] then GERA abrogates state immunity as to that claim as well.[6]

Ward alleges that, after she was interviewed at work regarding Jones's sexual harassment charge, she received phone calls threatening termination "if [she] did not back off." Ward instead held a press conference, publicly supporting Jones's allegations of sexual harassment in the Governor's Office. The Governor's Office then placed Ward on leave while it investigated her "participation in [the] March 9, 1994, press conference, and whether, through that participation, [she] breached [her] duty of loyalty to [her] employer." At the close of the investigation, Ward was terminated.

**[13]** The First Amendment prohibits state retaliation against a public employee for speech made as a citizen on a matter of public concern. *Connick* v. *Myers*, 461 U.S. 138, 146-47 (1983). We have held that complaints of sexual

---

[5]As Jones's retaliatory discharge claim alleges conduct that would violate the Equal Protection clause, we do not consider whether it also alleges conduct that would violate the First Amendment.

[6]Ward is not seeking relief directly under the First Amendment, just as she and Jones are not seeking relief for discriminatory treatment under the Fourteenth. The relief Ward seeks is under GERA and her theory, as we understand it, is that she was retaliated against for exercising her GERA rights and that this is itself a GERA violation. Whether this is true is a matter to be answered by the EEOC in the first instance; we express no view.

harassment can constitute such speech. *Freitag* v. *Ayers*, 468 F.3d 528, 545 (9th Cir. 2006); *see also Connick*, 461 U.S. at 148 n.8 (racial discrimination in a public workplace is "a matter inherently of public concern"). Ward was alleging misconduct in the Governor's Office: mistreatment of some Alaskans because of race and sex. The allegations were made publicly, as well as through internal channels, and received press coverage. The allegations could have affected the gubernatorial race and had far-reaching effects on Alaskan politics; the public interest in such allegations is plain. The Governor's Office has admitted that it placed Ward on leave and began the investigation that led to her firing because of Ward's public statements: "Following that press conference, [Ward was] placed on paid, administrative leave because [her] conduct was contrary to the Governor's interests and because we wanted [her] out of the office so that we could conduct an unimpeded investigation."

**[14]** That Ward's statements arose out of Jones's employment grievance doesn't mean Ward wasn't speaking as a citizen on a matter of public concern. Unlike the employee in *Connick*, Ward was not speaking about her "personal employment dispute," nor were her comments directed solely at co-workers. 461 U.S. at 148 n.8. Rather, Ward held a press conference to protest what she saw as sex discrimination in the Governor's Office. The Supreme Court has held that such public criticism by government employees of their employers is protected speech. *Pickering* v. *Bd. of Ed.*, 391 U.S. 563 (1968); *see Givhan* v. *W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979).

**[15]** "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti* v. *Ceballos*, 547 U.S. 410, 421 (2006); O'Scannlain dissent at 5082-84. But Ward's official duties didn't require her to complain about the conditions of Jones's employment,

or to bring the alleged sexual harassment to the public's attention.[7] *Cf. Garcetti*, 547 U.S. at 421 ("[Complainant] wrote his . . . . memo because that is part of what he . . . was employed to do."). Her speech at the press conference was her own. *Cf. Pleasant Grove City* v. *Summum*, No. 07-665, slip op. at 8, 10 (S. Ct. Feb. 25, 2009) (government speech is financed, commissioned or controlled by the government). Because retaliation for this kind of speech violates the First Amendment as incorporated into the Due Process Clause, Congress has the power to provide a private remedy for it. *Georgia*, 546 U.S. at 158.

---

[7] Judge O'Scannlain argues that an aide to a high-ranking official has no First Amendment right to air his policy differences with the administration. O'Scannlain dissent at 5084. We needn't consider this interesting hypothetical, because, as the first part of Judge O'Scannlain's opinion ably explains, "although states can . . . adopt policies that treat women differently . . . they do not often . . . adopt policies to harass women sexually." *Id.* at 5078. It's a bit like saying that, when an employee discloses that the Governor is taking bribes, the employee is airing his differences with the official policy of accepting bribes. Ward was exposing the office's alleged illegal practice of tolerating sexual harassment; such criticisms can certainly be the basis for a First Amendment claim. *See Johnson* v. *Multnomah County*, 48 F.3d 420, 425-26 (9th Cir. 1995) (government employee retaliated against for publicly accusing her boss of running a "good old boy network" can bring a First Amendment claim). Whether Ward's disloyalty and disruption of the office provided a valid basis for firing her and outweighed her speech interest is not at issue here. We are not deciding whether Ward should prevail on her First Amendment claim; we merely hold that it *is* a First Amendment claim. *See Eng* v. *Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009) (to make a First Amendment retaliation claim, government employee must allege that the speech addressed an issue of public concern, was spoken in the employee's capacity as a private citizen and that the employer took adverse action against the employee because of the speech; burden then shifts to the government to show that its legitimate administrative interests outweigh the employee's First Amendment rights or that the adverse action would have been taken absent the speech).

## Conclusion

**[16]** Each of Jones and Ward's claims allege actual violations of the Fourteenth Amendment. GERA has validly abrogated Alaska's sovereign immunity with respect to these claims. The petition for review is therefore denied and the case is remanded to the EEOC for further proceedings.

**DENIED.**

---

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the court's determination that the allegations of sex discrimination, if true, would establish that the State of Alaska, through its Governor's Office, violated the Constitution's Equal Protection Clause, I do not think the same can be said for the allegation of retaliatory discharge in violation of the First Amendment. In my view, that claim does not state an actual constitutional violation. We must therefore analyze the statute under which the claim is made, the Government Employee Rights Act of 1991 ("GERA"), to determine whether it is valid prophylactic legislation under section 5 of the Fourteenth Amendment. *See generally City of Boerne v. Flores*, 521 U.S. 507 (1997). I believe GERA fails such scrutiny. With respect, I must dissent from the court's opinion insofar as it holds that Alaska's sovereign immunity does not preclude the claim of retaliatory discharge.

I

Section 5 of the Fourteenth Amendment grants Congress the "power to enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]." U.S. Const. amend. XIV, § 5. As the majority correctly explains, in order for Congress to abrogate state sovereign immunity pursuant to this

enforcement power, it must "unequivocally express[ ] its intent to abrogate that immunity" and "act[ ] pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Although I believe it to be a close question, and Judge Ikuta's conscientious dissent to the contrary notwithstanding, it seems to me that Congress did express its intent to abrogate sovereign immunity in the GERA. With respect to the second requirement, Congress acts pursuant to a valid grant of constitutional authority if it either passes so-called "prophylactic legislation" or enacts remedies for actual violations of the Constitution. For "purportedly prophylactic legislation [to] constitute[ ] appropriate remedial legislation, . . . 'there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Kimel*, 528 U.S. at 81 (quoting *Boerne*, 521 U.S. at 520). Actual remedial laws, as the majority points out, do not have to meet this test. *See United States v. Georgia*, 546 U.S. 151, 158 (2006) ("[N]o one doubts that § 5 grants Congress the power to enforce the provisions of the Amendment by creating private remedies against the States for *actual* violations of those provisions." (internal quotations marks and alteration omitted)).

A crucial threshold question, then, is whether a given claim against a state alleges conduct that would violate the Fourteenth Amendment to the Constitution. The allegations of pay discrimination state straightforward violations of the Equal Protection Clause, and I join the majority's opinion on that issue in its entirety. With respect to the claim of sex discrimination stemming from Jones' sexual harassment complaint, I concur in the result but remain wary of some of the majority's reasoning. Finally, I must disagree entirely with the majority's analysis of the purported First Amendment claim of retaliatory discharge, an analysis that wrongly enlarges the constitutional implications of employment decisions at the highest levels of state government.

A

While I agree with the majority's conclusion regarding the so-called sexual harassment issue, I wish to clarify that I read the majority opinion to hold no more than that it would violate the Equal Protection Clause if a state deliberately refused to protect its female employees from sexual harassment. In other words, it is not the sexual harassment that Jones allegedly suffered, as such, that generates her constitutional claim. After all, she does not claim that the State of Alaska, through the official acts of its agents, sexually harassed her. Rather, the constitutional claim properly rests on Jones's allegation that the Governor's Office, an arm of the State, responded to her formal complaint of sexual harassment by firing her.

It is worth pausing to consider this claim carefully, for it is not the ordinary instance of unconstitutional discrimination. In most suits against a state where sexual harassment is involved, it will make more sense to characterize the claim not as one for sexual harassment "but as a claim of failure to protect against such harassment." *Bohen v. City of East Chicago*, 799 F.2d, 1180, 1189 (7th Cir. 1986) (Posner, J., concurring). This is because, although states can pass laws or adopt policies that treat women differently in hiring, pay, or other official emoluments of employment, they do not often pass laws or adopt policies to harass women sexually. However, "[i]f a state or city deliberately refused to provide police protection for women, it would be violating the equal protection clause" regardless of whether those who harassed them were state actors. *Id.* at 1190. In order for such a claim to succeed, there would have to be "a policy of nonresponse to complaints of harassment, or an authoritative decision not to respond." *Id.* In view of these considerations, I understand the majority to hold that Alaska's "authoritative decision not to respond" to Jones' formal complaint, but to fire her instead, if that is what happened, violated the Equal Protection Clause.

The logical corollary to this holding is that sexual harassment, as such, does not ordinarily violate the Equal Protection Clause.[1] This is because discrimination can only violate equal protection if it is *intentional* and *done by the state*. *Cf. Washington v. Davis*, 426 U.S. 229, 238-45 (1976) (holding that evidence of discriminatory intent is necessary to make out an equal protection violation assuming the government action is neutral on its face). The actions of the Governor's aide in this case would not bring liability on Alaska unless the state officially sanctioned them. As the majority recognizes, the Constitution cannot support liability against the state for constitutional torts on the agency law theory of *respondeat superior*. Maj. Op. at 5072.

Thus, there is a crucial limitation to the majority's statement that sexual harassment *can* state a violation of the Equal Protection Clause, *see* Maj. Op. at 5071. This possibility is limited by the bedrock constitutional principle I have discussed: sexual harassment *will* state a violation *only* where there is intentional discrimination by the state.

I dwell on this caveat in order to emphasize that, without it, we would constitutionalize the type of claim employees might bring under Title VII. Such a result would be directly contrary to Supreme Court precedent. *See Davis*, 426 U.S. at 239 ("We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today."). And the cases from sister circuits on which the majority relies followed the Court's guidance. As the majority opinion stated in *Bohen*, "the ultimate inquiry,"

---

[1]I hasten to add that the conduct Jones complained of is outrageous and unsavory; I do not mean to condone it in any way. At the same time, we should acknowledge that the State of Alaska has not conceded the truth of the allegations either of Jones or of Ward. Indeed, there seems to be vigorous dispute about the facts underlying their dismissal from the Governor's Office.

where someone alleges sexual harassment *as a violation of equal protection*, "is whether the sexual harassment constitutes intentional discrimination. This differs from the inquiry under Title VII as to whether or not the sexual harassment altered the condition of the victim's employment." *Bohen*, 799 F.2d at 1187.

Thus, I agree with the majority that Jones' claim—that the Governor's Office fired her rather than respond to her complaint of sexual harassment—states a violation of the Equal Protection Clause. But it is not the alleged sexual harassment but rather the "authoritative decision not to respond," *Bohen*, 799 F.2d at 1190, that justifies such conclusion.

B

Turning now to Ward's allegation of retaliatory discharge in violation of the First Amendment, as incorporated against the states through the Fourteenth, I note that, at oral argument, counsel for Ward admitted that his client's actual, First Amendment claim under the relevant case law was a "tough" one to make out. No wonder. This case, it seems to me, is a prototypical example of an employee's attempt to "constitutionalize [an] employee grievance," a practice that the Supreme Court has explicitly discouraged. *See Connick v. Myers*, 461 U.S. 138, 154 (1983). But it goes farther even than that, for Ward attempts to constitutionalize a political spat over her loyalty to the administration of Alaska's Governor. With respect, the majority's approval of Ward's novel theory opens up a new frontier in this area of constitutional law, which, I believe, contravenes the spirit, if not the letter, of the Supreme Court's decisions on the subject.

1

In general, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

This is because the "government as employer indeed has far broader powers than does the government as sovereign." *Id.* (quoting *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion)). The reason the government would violate the First Amendment at all by firing one of its employees on account of what he or she said is that employees, as citizens, "retain the prospect of constitutional protection for their contributions to the civic discourse." *Id.* at 422. It is thus necessarily within that context that we apply the doctrinal test for whether a public employee has alleged a First Amendment violation for retaliatory discharge.

Such test has two parts. First, unless "the employee spoke as a citizen on a matter of public concern[,] . . . . the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at 418. Only if the employee passes this threshold does "the *possibility* of a First Amendment claim arise[ ]." *Id.* (emphasis added). A court must then evaluate that possibility under the balancing test of *Pickering v. Board of Education of Township High School District 205*. *See* 391 U.S. 563, 568 (1968); *Garcetti*, 547 U.S. at 418.

At the threshold stage, as *Garcetti* illustrated, First Amendment protection attaches only to speech analogous to that which an ordinary citizen would make as part of public discourse. 547 U.S. at 423 ("Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."). The First Amendment does not give more license to government employees than ordinary citizens. This is the meaning of the Supreme Court's admonition that the First Amendment neither "invest[s] [public employees] with a right to perform their jobs however they see fit," nor "empower[s] them to constitutionalize the

employee grievance." *Id.* at 420, 422 (internal quotation marks omitted).[2]

2

As I read the precedents, Ward has failed to state a claim under the First Amendment for retaliatory discharge.

To state a First Amendment claim, the employee must show that he or she spoke not as an employee, but as a private citizen in public discourse. *See Garcetti*, 547 U.S. at 418-25. The majority's analysis on this point addresses the requirements of "speech as a citizen" and "matter of public concern" in rather narrow terms. To be sure, they are two distinct requirements for constitutional protection. *Ceballos v. Garcetti*, 361 F.3d 1168, 1186-87 (9th Cir. 2004) (O'Scannlain, J., specially concurring) (insisting on both the "speech as a citizen" and "matter of public concern" prongs of the threshold inquiry), *overruled by Garcetti*, 547 U.S. at 426. But the idea behind the caselaw is to ensure that public employees are still able to participate in public debate, not to provide them job security while they pursue their own ends. *See, e.g.*, *Pickering*, 391 U.S. at 573 (rejecting the school's attempt to "limit[ ] teachers' opportunities to contribute to public debate"); *see also Garcetti*, 547 U.S. at 419 ("The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government

---

[2]We have also recently clarified that, at the second, balancing stage, "the plaintiff bears the burden of showing the state took adverse employment action and that the speech was a substantial or motivating factor in the adverse action." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) (internal quotation marks and alterations omitted). If the plaintiff carries that burden, then the government must show that, under *Pickering*, its "legitimate administrative interests outweigh the employee's First Amendment rights" or that it would have made the same decision without the employee's protected speech. *Id.* at 1071-72 (internal quotation marks omitted). In my view, for the plaintiff to state a First Amendment claim, he or she must meet at least the initial burden under *Eng*.

employees engaging in civic discussion."). We must keep our eye on the ball here, for the case before us throws something of a curve.

The typical situation requires a court to determine whether speech was primarily an internal office matter or a contribution to the public debate. *See, e.g.*, *Connick*, 461 U.S. at 140 (considering "whether the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs"). But this case involves policymaking staff in the office of the chief executive of the State of Alaska. Thus, the internal office politics are also the politics of the state. In this context, it contravenes the spirit of *Garcetti* and its predecessors to hold that, even though Ward criticized the Governor on a subject of public interest the Governor cannot constitutionally fire her for disloyalty.

The majority spends time illustrating that Ward's speech was not part of her official duties, which is surely correct. *Garcetti* does not squarely dictate the result in this case for that reason. Maj. Op. at 5074-75; *Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."). But the controlling ratio decidendi of *Garcetti* casts a longer shadow. The importance of the official nature of the speech in *Garcetti* lay in the distinction between speech that ordinary citizens make and speech that only occurs because of employment with the government. "Restricting speech that owes its existence to a public employee's professional responsibilities," the Court insisted, "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. *Garcetti* explicitly contrasted such speech with "the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day." *Id.* at 422.

Thus, although Ward's press conference was not strictly part of her official duties, her importance in the Governor's administration necessarily means that more of her conduct came within the legitimate purview of her employer. The Supreme Court has emphasized the need to "afford[ ] governmental employers sufficient discretion to manage their operations." *Id.* at 422. Nowhere is such discretion more important than at the highest levels of state government. At those levels, loyalty to the administration on matters of public concern is in a sense the price of employment. Ward chose to go public with one side of an internal struggle among the Governor's policy aides. The Governor's Office considered this to be disloyal and fired her. Especially in the context of a governor's office, this is a classic employment decision of the kind the Supreme Court has warned should not "bec[o]me a constitutional matter." *Connick*, 461 U.S. at 143. We must remember that "a federal court is not the appropriate forum in which to review the wisdom of [such] a personnel decision." *Id.* at 147.

It helps to consider analogies. Take the example of an aide to a governor who criticizes publically the governor's tax policy in a press conference. Such speech would be an undoubted contribution to the public debate, but would it violate the First Amendment if the governor fired the aide for disloyalty? I think not, and I imagine the majority would agree. And if the aide criticized not tax policy but the governor's policy regarding internal complaints of sexual harassment? The result is the same, even though the subject of the criticism is a potentially illegal practice (ignoring sexual assault on female employees).[3]

---

[3]The majority conflates the supposed policy of ignoring illegality with the illegality itself, quoting back to me my observation that states sometimes adopt policies to treat women differently but not usually to harass them sexually. Maj. Op. 5075 n. 7. This only confuses the issue. My point is that the scope of an employee grievance, as opposed to a contribution as a citizen to public debate, necessarily widens the higher one climbs up the ladder of government.

Such a result would only seem harsh from the myopic perspective of the conviction that the Constitution must provide remedies for all harms. We can, and should, take allegations like those Ward made very seriously without invoking the First Amendment. "As the [Supreme] Court noted in *Connick*, public employers should, 'as a matter of good judgment,' be 'receptive to constructive criticism offered by their employees.' " *Garcetti*, 547 U.S. at 425 (quoting *Connick*, 461 U.S. at 149). Indeed, "[t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing."[4] *Id.* In the appropriate circumstances, we must rely on such customary and legislative protections if we are to avoid "constitutionaliz[ing] the employee grievance." *Connick*, 461 U.S. at 154.

## II

My conclusion that the allegation of retaliatory discharge does not state an actual violation of the Constitution compels me to address, insofar as the claim is remediable under the GERA, whether that statute constitutes valid "congruent and proportional" legislation under the Supreme Court's *Boerne* test.

## A

Congress' power to enforce the Fourteenth Amendment under section 5 does not allow it "to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the [Fourteenth Amendment] cannot be said to be enforcing [it]." *Boerne*, 521 U.S. at 519. *Boerne* requires that for "purportedly prophylactic legislation [to] constitute[ ] appropriate remedial legislation, . . . 'there must be a congruence and proportionality between the

---

[4]Alaska, in fact, has such a whistle-blower protection law. Alaska Stat. 39.90.100-.150.

injury to be prevented or remedied and the means adopted to that end.' " *Kimel*, 528 U.S. at 81 (quoting *Boerne*, 521 U.S. at 520).

Because prophylactic legislation prohibits or regulates constitutional conduct that supposedly leads to unconstitutional conduct, Congress must explain its belief that regulating the former will help to prevent the latter. *See Boerne*, 521 U.S. at 51-20. Such requirement responds to the Supreme Court's concern in *Boerne* that Congress not "decree the substance of the Fourteenth Amendment's restrictions" under the guise of enforcing them. *Id.* at 519. The Supreme Court has outlined a three-step test for determining congruence and proportionality. "The first step . . . is to identify with some precision the scope of the constitutional right at issue." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). Next, Congress must have identified a history and "pattern of constitutional violations" by the states. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639-640 (1999); *see also Garrett*, 531 U.S. at 368. Finally, legislation must be in fact "congruent and proportional," in light of Congress' factual findings, "to the targeted violation." *Garrett*, 531 U.S. at 374. It seems to me that the crucial step in this case is the second one—the requirement that Congress identify a pattern of constitutional violations. One way courts pursue this inquiry is "by examining the legislative record containing the reasons for Congress' action." *Kimel*, 528 U.S. at 88.

The parties do not dispute that, when Congress enacted the GERA in 1991, it made no findings regarding discrimination against state employees at the policy-making level. When it passed the Equal Employment Opportunity Act in 1972, however, Congress did make extensive factual findings. H.R. Rep. No. 92-238, at 19 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2152 (noting the existence of "widespread discrimination against minorities . . . in State and local government employment, and that the existence of this discrimination is

perpetuated by the presence of both institutional and overt discriminatory practices"). The EEOC would like us to consider the latter findings in evaluating the former law for purposes of the *Boerne* test.

The EEOC's theory is that, with the GERA, Congress merely finished the job it started in 1972 when it amended Title VII to cover the States as employers. It cites extensive language from Supreme Court opinions and congressional records to show that gender discrimination persisted in state government as of 1991 the way it had existed in 1972.[5] But all of the passages the EEOC quotes speak of gender discrimination in general, not at the policymaking levels of state government to which the GERA applies. The EEOC argues that it need not present such particularized congressional findings. It cites for support Justice Powell's concurrence in *Fullilove v. Klutznick*, 448 U.S. 448 (1980). But the question is what the more recent *Boerne* requires. A concurrence published seventeen years before *Boerne* is not probative of that question.

Furthermore, even if one could consider the 1972 findings, they do not pertain to the policymaking staff covered by the GERA. In 1972, Congress did find widespread discrimination in state and local government and it acted to prevent it, *but it specifically excluded personal and policymaking staff*. That is part of the background against which Congress legislated when it enacted the GERA. If one wants to impute congressional intent to that exclusion, the only responsible imputation is that Congress did not believe a remedy was necessary with respect to policy-making employees. That is to say, if there is

---

[5]There is no attempt to show congressional concern for the violation of First Amendment rights per se. The EEOC's and Intervenor Ward's argument seems to be that preventing retaliatory discharges against state employees for complaining about sexual harassment is part of Congress' prophylactic remedy for unconstitutional gender discrimination. It therefore stands or falls with the legitimacy of prophylactic remedies for employment discrimination.

any reason to believe what one reads in committee reports, the official position of the relevant House Committee belies the EEOC's position. In a section of the committee report entitled "Need for the Bill," it declared that the "time ha[d] come to bring an end to job discrimination once and for all," and that "[i]t is essential that . . . effective enforcement procedures be provided the [EEOC] to strengthen its efforts to reduce discrimination in employment." H.R. Rep. No. 92-238, at 2139-41. It would follow logically from this language that whatever levels of state and local employment Congress exempted from the 1972 Act's reach did not suffer from the job discrimination that so concerned the House Committee.

The background against which Congress enacted the GERA, therefore, does not illustrate that Congress had already found a pattern of unconstitutional discrimination at the policymaking level of state and local employment. Instead it shows that Congress had excluded employees at that level from protection. Because Congress explicitly excluded policymaking employees from Title VII's reach in 1972, I do not believe this court would be justified in using the findings Congress made in doing so to support its decision in 1991 to repeal that very exclusion.

Without the 1972 findings, the EEOC can point to no evidence that Congress identified, as the Supreme Court has required it to do, a history and pattern of violations of the constitutional rights of the states against high-level personal and policy-making employees. This compels me to conclude that the GERA is not "congruent and proportional" legislation within the meaning of *Boerne*. It therefore cannot constitute a valid abrogation of state sovereign immunity.

Neither the EEOC nor the federal courts are empowered to entertain the non-constitutional claim against the State of Alaska, which, as I have explained, is precisely Ward's retaliation claim. I must respectfully dissent from the majority's conclusion to the contrary.

IKUTA, Circuit Judge, with whom Judges TALLMAN and CALLAHAN join, dissenting:

To determine whether Congress validly abrogates a state's sovereign immunity, we must answer two questions: "first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73 (2000). With respect to the first question, the Supreme Court has explained that Congress's intent must be both "unequivocal and textual." *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989); *accord Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) ("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.").

The majority concludes that the Government Employee Rights Act of 1991 (GERA), Pub. L. 102-166, title III, 105 Stat. 1071, 1088, meets this "stringent" clear-statement rule. *Dellmuth*, 491 U.S. at 228. I disagree. In my view, a careful analysis of GERA reveals that the standard laid out in *Dellmuth* and *Atascadero*, and applied by the Court many times since, has not been met. GERA does not explicitly abrogate state sovereign immunity; it does not specify states as potential defendants; and it does not create a statutory scheme under which states are the only possible defendants. Therefore, I respectfully dissent.

I

*Atascadero* and *Dellmuth* considered, respectively, whether the Rehabilitation Act and the Education of the Handicapped Act abrogated state sovereign immunity. Both acts naturally and logically included states as potential defendants. But the Supreme Court concluded that, in both statutes, Congress did not sufficiently express its intent to subject the states to liability.

A

In *Atascadero*, a case from our circuit, a graduate student sued a California state hospital for discriminating against him in violation of the conditions imposed by the Rehabilitation Act. We held that Congress adequately expressed its intent to abrogate state sovereign immunity because the Rehabilitation Act authorized suits against recipients of federal assistance, and because the "Act contains extensive provisions under which states are the express intended recipients of federal assistance." *Scanlon v. Atascadero State Hosp.*, 735 F.2d 359, 360 (9th Cir. 1984). Specifically, we noted that "Section 794 of the Rehabilitation Act broadly bars 'discrimination under any program or activity receiving federal financial assistance,' " and that "§ 794a(a)(2) provides remedies, procedures, and rights against 'any recipient of Federal assistance.' " *Id.* We reasoned that, "[i]f states receive federal assistance under the statute, they plainly fall within the defined class of potential defendants." *Id.* We therefore concluded that we could logically infer a congressional intent to abrogate state sovereign immunity from the Rehabilitation Act's authorization of suit against a class of defendants that necessarily included states. *Id.*

The Supreme Court reversed our decision:

The statute thus provides remedies for violations of § 504 by "any recipient of Federal assistance." There is no claim here that the State of California is not a recipient of federal aid under the statute. But given their constitutional role, the States are not like any other class of recipients of federal aid. A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically.

473 U.S. at 245-46 (citations omitted). Thus despite the fact that the Rehabilitation Act logically included states within its universe of potential defendants, and despite the states' common role as "recipient[s] of Federal assistance," the Court held "that the Rehabilitation Act does not abrogate the Eleventh Amendment bar to suits against the States." *Id.*

Similarly, in *Dellmuth*, the parent of a child with a learning disability brought an action against the child's school district and Pennsylvania's secretary of education under the Education of the Handicapped Act (later renamed the Individuals with Disabilities Education Act, *see* P.L. 101-476, 104 Stat. 1103, 1141-42 (1990)). *See* 491 U.S. at 225. The Third Circuit held that "the text of EHA and its legislative history leave no doubt that Congress intended to abrogate the 11th amendment immunity of the states." *Id.* at 227 (quoting *Muth v. Central Bucks Sch. Dist.*, 839 F.2d 113, 128 (3d Cir. 1988)). According to the Third Circuit, "[b]ecause the EHA and its legislative history reflect the 'most basic of political knowledge that free public education is provided by and under the aegis of the states,' . . . Congress clearly contemplated litigation under the Act against a state in the federal courts." *Muth v. Central Bucks Sch. Dist.*, 839 F.2d 113, 129 (3d Cir. 1988) (quoting *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 422 (1st Cir. 1985)).

Again, the Supreme Court reversed. The Court summarily rejected two "nontextual arguments" for abrogation: first, "that abrogation is 'necessary to achieve the EHA's goals,' " and second, that Congress had amended the Rehabilitation Act after *Atascadero* to expressly abrogate state sovereign immunity. 491 U.S. at 228-29. The Court deemed both these arguments "beside the point" and pointedly discouraged arguments based on legislative history. *Id.* at 230 ("Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment. If Congress' intention is 'unmistakably clear in the language of the statute,' recourse to legislative history will be

unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the rule of *Atascadero* will not be met." (quoting *Atascadero*, 473 U.S. at 242)).

With respect to the statutory language of the Education of the Handicapped Act (the "proper focus of an inquiry into congressional abrogation of sovereign immunity"), the Court held that none of the provisions on which the Third Circuit relied met *Atascadero*'s clear-statement requirement. *Dellmuth*, 491 U.S. at 231. The Third Circuit had focused on the Act's findings, in which Congress stated, "it is in the national interest that the Federal government assist State and local efforts to provide programs to meet the education needs of handicapped children in order to assure equal protection of the law." *Muth*, 839 F.2d at 128 (quoting 20 U.S.C. § 1415(e)(2)) (alteration in original). The Court dismissed this reasoning: "the general statement of legislative purpose in the Act's preamble simply has nothing to do with the States' sovereign immunity." 491 U.S. at 231.

The Third Circuit also relied heavily on the Education of the Handicapped Act's judicial review provision, which allowed parties aggrieved by the administrative process to "bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 839 F.2d at 129 (quoting). The Court rejected this analysis as well, reiterating its statement in *Atascadero* that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." 491 U.S. at 231 (quoting *Atascadero*, 473 U.S. at 246).

The Court recognized that "the EHA's frequent reference to the States, and its delineation of the States' important role in securing an appropriate education for handicapped children, make the States, along with local agencies, logical defendants in suits alleging violations of the EHA." *Id.* at 232.

Despite this recognition that the Act's "statutory structure lends force to the inference that the States were intended to be subject to damages actions for violations of the EHA," the Court held that "such a permissible inference, whatever its logical force, would remain just that: a permissible inference. It would not be the unequivocal declaration which, we reaffirm today, is necessary before we will determine that Congress intended to exercise its powers of abrogation." *Id.* at 232. Accordingly, the Court held that "the statutory language of the EHA does not evince an unmistakably clear intention to abrogate the States' constitutionally secured immunity from suit." *Id.* at 232.

This clear-statement rule has been criticized for being exceptionally demanding. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 75 (1989) (Brennan, J., dissenting) ("Where the Eleventh Amendment applies, the Court has devised a clear-statement principle more robust than its requirement of clarity in any other situation. Indeed, just today, the Court has intimated that this clear-statement principle is not simply a means of discerning congressional intent." (citing *Dellmuth*, 491 U.S. at 232)). But it is binding precedent: under *Atascadero* and *Dellmuth*, abrogation by inference is not enough.

## B

Although the *Atascadero-Dellmuth* bar is extraordinarily high, it is not insurmountable. Applying these two decisions, the Court has held that Congress can sufficiently express its intent to abrogate state sovereign immunity in one of three ways:

First, Congress may explicitly provide that it intends to abrogate state sovereign (or Eleventh Amendment) immunity. *See, e.g.*, *United States v. Georgia*, 546 U.S. 151, 153 (2006) (quoting the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.*, which "provides that 'a State shall not be

immune under the eleventh amendment to the Constitution of the United States from an action in a Federal or State court of competent jurisdiction for a violation of this chapter' " (internal alterations omitted)); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 635 (1999) (quoting the Patent Remedy Act, 35 U.S.C. § 296(a), which provides that "[a]ny State . . . shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court . . . for infringement of a patent" (alteration in original)).

Second, Congress may specifically define states as potential defendants. *See, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (finding an intent to abrogate state sovereign immunity in the Family and Medical Leave Act, 29 U.S.C. § 2617, where the act expressly allowed a suit against a "public agency," defined "to include both 'the government of a State or political subdivision thereof' and 'any agency of . . . a State, or a political subdivision of a State' " (quoting 29 U.S.C. §§ 203(x), 2611(4)(A)(iii)) (alterations in original)); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (finding an intent to abrogate state sovereign immunity in the Age Discrimination in Employment Act (ADEA) because it incorporated by reference a provision in the Fair Labor Standards Act (FLSA) that allowed suit against a "public agency," which in turn was defined by the FLSA to include "the government of a State").

Third, Congress may create a statutory scheme under which states are the only possible defendants. In *Seminole Tribe of Fla. v. Florida*, the Court held that the Indian Gaming Regulatory Act (IGRA) expressed a congressional intent to abrogate state sovereign immunity, although the Court also held that purported abrogation invalid. 517 U.S. 44, 57, 72 (1996). The Court explained that it agreed with the Eleventh Circuit's holding below (as well as with the parties "and with virtually every other court that has confronted the question") that

IGRA provided an "unmistakably clear" statement of its intent to abrogate state sovereign immunity. 517 U.S. at 56 (quoting *Dellmuth*, 491 U.S. at 228). The Court noted that IGRA imposed duties on "a State" to negotiate in good faith with Indian Tribes, and created a complex remedial scheme imposing various liabilities on "the State" that shirked its responsibilities under IGRA. *Id.* at 56-57. The Court concluded that IGRA's provisions "refer to 'the State' in a context that makes it clear that the State is the defendant to the suit brought by an Indian tribe," *id.* at 57, observing that IGRA's detailed remedial provisions scheme "repeatedly refers exclusively to 'the State.' " *Id.* at 75 n.17 (explaining why IGRA's remedial scheme implicitly precluded prospective injunctive relief under *Ex Parte Young*). Thus the Court, like the Eleventh Circuit in the decision below, concluded that the *Atascadero-Dellmuth* clear-statement rule was satisfied where Congress had created a statutory scheme that would have no effect at all if states were not potential defendants. *See Seminole Tribe v. Florida*, 11 F.3d 1016, 1024 (11th Cir. 1994) ("The only possible defendant to such a suit [under IGRA] is a state. Thus, unless Congress intended to abrogate the states' immunity, this portion of IGRA would be of no effect.").

In none of these cases, however, has the Court backed away from its holding in *Atascadero* and *Dellmuth* that nothing short of an unambiguous and textual statement will suffice. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (following *Atascadero* and holding that general statutory language prohibiting mandatory retirement did not subject states to liability).

## II

GERA does not meet the stringent standard set by *Atascadero* and *Dellmuth*. GERA contains no express statement of congressional intent to abrogate state sovereign immunity, and it does not specifically define the states as defendants.

Indeed, GERA contains no express definition of the individuals and entities subject to claims under its provisions. The two relevant GERA provisions in effect when Ward and Jones brought their claims in 1994 simply defined what types of discriminatory conduct were prohibited[1] and which government employees could bring claims.[2] Nor did GERA's remedies

[1]Section 302, 105 Stat. at 1088, codified at 2 U.S.C. § 1202 (1994), established the right of employees of the Senate to be free from specified forms of discrimination:

> All personnel actions affecting employees of the Senate shall be made free from any discrimination based on—
>
> > (1) race, color, religion, sex, or national origin, within the meaning of section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16);
> >
> > (2) age, within the meaning of section 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a); or
> >
> > (3) handicap or disability, within the meaning of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) and sections 102-104 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112-14).

[2]Section 321(a) of GERA, 105 Stat. at 1097-98, codified at 2 U.S.C. § 1220(a) (1994), defined the employees who were entitled to the protections of Section 302 of GERA to include state and local political appointees:

> The rights, protections, and remedies provided pursuant to section 302 [establishing the right of Senate employees to be free from specified discrimination] and 307(h) [establishing the remedies for violation of that right] of this title shall apply with respect to employment of any individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof—
>
> > (1) to be a member of the elected official's personal staff;
> >
> > (2) to serve the elected official on the policymaking level;
> >
> > (3) to serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.

Section 321 was later redesignated as Section 304 by the "Congressional Accountability Act of 1995," Pub. L. 104-1 § 405, 109 Stat. 3, 41.

provision, Section 307(h),**³** incorporate by reference any other provision of law expressly and unequivocally abrogating state sovereign immunity, as was the case in *Kimel*.

A

The majority cites GERA's cross-reference to Title VII's back-pay remedy and concludes, based on Title VII's use of the word "employer," that this cross-reference satisfies the *Atascadero-Dellmuth* clear-statement rule. Maj. Op. at 5069 ("GERA's provisions, entitling state employees to 'back pay . . . payable by the employer,' 42 U.S.C. §§ 2000e-5(g)(1), 2000e-16c, unmistakably express Congress's intent to allow suits against states for damages." (alterations in original)). Citing *Kimel*, the majority states that "GERA is cut from the same cloth as the ADEA," *id.* at 5069, suggesting that GERA

---

**³**Section 307(h) of GERA, 105 Stat. at 1092, codified at 2 U.S.C. § 1207(h) (1994), set forth the following remedies for a violation of GERA:

> If the hearing board determines that a violation has occurred, it shall order such remedies as would be appropriate if awarded under section 706 (g) and (k) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5 (g) and (k)), and may also order the award of such compensatory damages as would be appropriate if awarded under section 1977 and section 1977A (a) and (b)(2) of the Revised Statutes (42 U.S.C. 1981 and 1981A (a) and (b)(2)). In the case of a determination that a violation based on age has occurred, the hearing board shall order such remedies as would be appropriate if awarded under section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a(c)). Any order requiring the payment of money must be approved by a Senate resolution reported by the Committee on Rules and Administration. The hearing board shall have no authority to award punitive damages.

The remedies in Section 307(h) were amended and moved to Section 302(b) in 1995. *See* Pub. L. 104-1 § 504, 109 Stat. 3, 40-41. They are currently codified at 42 U.S.C. § 2000e-16b(b).

incorporates Title VII's definition of states as defendants in the same way that the ADEA incorporates the FLSA's.[4]

This analogy does not survive close examination. As *Kimel* explained, the ADEA incorporates various rights of action under the FLSA: the ADEA, 29 U.S.C. § 626(b), states that "[t]he provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in" section 216(b) of the FLSA, 29 U.S.C. § 216(b). This cross-referenced provision, section 216(b) of the FLSA, provides that an "action to recover" back pay "may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The FLSA defines "public agency" as including, among other things, "the government of a State." 29 U.S.C. § 203(x). Because the ADEA incorporated the FLSA's enforcement provision, which provides parties a right of action against states, the Court concluded that the ADEA sufficiently expressed an intent to abrogate state sovereign immunity. *See Kimel*, 528 U.S. at 73-74.

GERA, by contrast, does not incorporate the provisions of Title VII that authorize plaintiffs to maintain civil actions, 42 U.S.C. §§ 2000e-5(f), 2000e-16(c). Nor does GERA incorpo-

---

[4]Title VII does not actually contain any provision that specifically provides for suit against states, but in a pre-*Atascadero* case the Supreme Court held, based on a passing reference to legislative history, that Title VII's definition of possible defendants expressed a congressional intent to abrogate state sovereign immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n.9 (1976). Although inconsistent with *Dellmuth*, 491 U.S. at 230, this holding is nonetheless controlling with respect to Title VII. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

rate Title VII's definition of "person[s]" subject to suit, 42 U.S.C. § 2000e(a). GERA merely provides that the remedies available to GERA claimants may include "such remedies as would be appropriate if awarded under section 706(g) and (k) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5(g) and (k))." 105 Stat. at 1091 (currently codified at 42 U.S.C. § 2000e-16b(b)). By making available such remedies "as would be appropriate," GERA indicates that Title VII's remedies are incorporated into GERA *mutatis mutandis*, i.e., with "all necessary changes having been made." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 17 (2000) (addressing a statutory scheme in which the Medicare Act provided for judicial review "to the same extent as is provided in" the Social Security Act). This is confirmed by the wording of section 706(g), the incorporated Title VII provision on which the majority relies. Section 706(g) states that in an EEOC civil enforcement action a "court may . . . order such affirmative action as may be appropriate," including "reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). The natural reading of GERA's statement that claimants have "such remedies as would be appropriate if awarded under section 706(g)" is that a court may award GERA claimants back pay, reinstatement, or other equitable remedies described in § 706(g) against appropriate GERA defendants. Section 706(g) deals with the types of remedies available, not with who can be sued. Reading GERA as allowing actions against any entity mentioned in § 706(g) would lead to the incongruous conclusion that GERA authorizes suits against employment agencies and labor organizations.

Because GERA does not expressly incorporate a cause of action against the states, but merely makes Title VII's remedies available for claims otherwise authorized under its provisions, GERA's cross-reference to Title VII does not provide

a basis for concluding that it unmistakably abrogates state
sovereign immunity.

## B

Nor can the majority rely on the fact that some of the
employees covered by GERA are employed by states. *Cf.*
Maj. Op. at 5068 ("GERA expressly covers state employees,
and expressly gives them a right to collect damages 'payable
*by the employer*'—the state." (emphasis in original)). As the
majority acknowledges, a "general authorization for suit in
federal court" is an insufficient expression of congressional
intent to abrogate state sovereign immunity, even if the states
are logically included within the definition of persons and
entities subject to suit. *Atascadero*, 473 U.S. at 245-46 ("The
statute thus provides remedies for violations of § 504 by 'any
recipient of Federal assistance.' There is no claim here that
the State of California is not a recipient of federal aid under
the statute.").

By the same token, the fact that state employees are within
the universe of potential GERA claimants is insufficient. As
explained above, GERA would have to define its potential
claimants in such a way as to make states the only possible
defendants before we could properly find an "unmistakably
clear" intent to abrogate state sovereign immunity. *Seminole
Tribe*, 517 U.S. at 56 (quoting *Dellmuth*, 491 U.S. at 228).
But unlike IGRA, the act at issue in *Seminole Tribe*, GERA
does not create a remedial scheme under which states are the
only potential defendants. It does not expressly impose any
duties or responsibilities on states. In fact, GERA's lone refer-
ence to "state employees" appears in the heading of Section
321, 105 Stat. at 1097, the text of which refers broadly to
appointees of elected officials of "any State or *political subdi-
vision* thereof" (emphasis added).[5] *See Intel Corp. v.*

---

[5]Section 302 of GERA was amended in 1995, after Ward and Jones
brought their claims, to refer to the state employees referred to in Section
321 (redesignated Section 304). *See* Pub. L. 104-1, 109 Stat. at 40. Neither
the majority nor the parties suggest that we should place any weight on
amendments made to GERA after Ward and Jones brought their claims.

*Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (holding that a statute's caption "cannot undo or limit that which the statute's text makes plain") (quoting *Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947) (alteration omitted)).

The plain language of GERA allows claims to be brought against a variety of non-state defendants not shielded by sovereign immunity. Most important, state officials are subject to suit under GERA. GERA allows an aggrieved employee to bring a claim for prospective injunctive relief, *see* GERA § 307(h), codified at 2 U.S.C. § 1207(h) (1994) (incorporating the injunctive relief remedies set forth in 42 U.S.C. § 2000e-5 and 29 U.S.C. § 633a), and sovereign immunity poses no bar to a GERA action against a state official so long as the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm. of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)); *see also Missouri v. Jenkins*, 491 U.S. 274, 290 (1989). Nothing in the text of GERA prevents a public employee from bringing an action against a state official in that official's individual capacity for violating GERA's non-discrimination requirement. *Cf. Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006) (holding that Title VII's definition of "employer" excludes individuals); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

Moreover, because GERA covers appointees of elected officials of a "political subdivision of any State," § 321(a), GERA claimants may also bring actions against political subdivisions of states, such as counties and municipalities, that are not shielded by sovereign immunity. *See Northern Ins. Co. v. Chatham County*, 547 U.S. 189, 193 (2006). The Tenth and Fifth Circuits have both held that GERA allows claims against counties. *See Fremont County v. EEOC*, 405 F.3d 840 (10th Cir. 2005); *Brazoria County v. EEOC*, 391 F.3d 685

(5th Cir. 2004). And we have construed the phrase "political subdivision of any State" in Title VII and the ADEA to include counties and cities. *See Ramirez v. San Mateo County Dist. Attorney's Office*, 639 F.2d 509 (9th Cir. 1981); *see also Monce v. City of San Diego*, 895 F.2d 560 (9th Cir. 1990).

## C

In sum, GERA does not unequivocally and textually abrogate state sovereign immunity. It does not (1) expressly invoke Congress's intent to do so, (2) specifically define states as defendants, or (3) make states the only possible defendants. Rather, the GERA provisions at issue in this case are indistinguishable from the EHA (now IDEA) provisions in *Dellmuth*, where the act allowed suit against recipients of federal education grants who failed to provide a "free appropriate public education" to schoolchildren. *Muth*, 839 F.2d at 116. Notwithstanding the "most basic of political knowledge that free public education is provided by and under the aegis of the states," *id.* at 129, the Court held that Congress had not provided an "unequivocal and textual" expression of intent to abrogate state sovereign immunity. *Dellmuth*, 491 U.S. at 230.

## III

The parties raise an additional argument as to why GERA abrogates state sovereign immunity. As noted above, the Supreme Court held in *Fitzpatrick* that Congress sufficiently expressed its intent to abrogate state sovereign immunity in Title VII of the Civil Rights Act of 1964, as amended. *See* 427 U.S. at 453 n.9. While the majority bases its abrogation analysis on GERA's cross-reference to Title VII's back-pay provision, Ward and EEOC argue, somewhat opaquely, that GERA is either part of Title VII or sufficiently similar to Title VII that we are bound by *Fitzpatrick*.

In light of *Atascadero* and *Dellmuth,* this argument is untenable. The proposition that GERA abrogates state sovereign immunity because its substantive prohibitions or policy goals are similar to those of Title VII is nothing if not an inference, and we cannot conclude Congress intended to abrogate state sovereign immunity unless it expressed that intent in the clearest terms. Nonetheless, *Fitzpatrick* remains binding precedent on the narrow issue it decided: that Title VII expresses a congressional intent to abrogate state sovereign immunity. *See Agostini*, 521 U.S. at 237. Although neither Ward nor the EEOC went so far in their briefs as to argue that GERA is actually part of Title VII, Ward's counsel indicated that he agreed with this position at oral argument.[6]

A review of the history of Title VII and GERA, however, makes clear that GERA is not, and never has been, a part of Title VII. Indeed, when Ward and Jones brought their claims in 1994, the two statutes were not even in the same title of the United States Code.

Title VII of the Civil Rights Act of 1964 prohibited employment discrimination based on race, color, religion, sex,

---

[6]Ward's brief notably stops short of claiming that Title III of the Civil Rights Act of 1991 (i.e., GERA) constitutes an amendment to Title VII of the Civil Rights Act of 1964, although when responding to our questioning Ward's counsel seemed willing to accept this position:

Q: I just want to make clear what your position is on this.

A: Right. I mean, Your Honor, I would not suggest that it's not part of Title VII. It's certainly an amendment to Title VII, codified as part of Title VII . . . . Yes, this definitely amends and adds to [Title VII]; it carries with it the same principles as Title VII. It adds a new basis of liability, and so in interpreting that new basis of liability—

Q: Why are you having trouble saying 'Yes, this is Title VII'? . . . . You're using double negatives and beating around the bush. Is it your position that GERA is Title VII?

A: Yes, GERA is part of Title VII, absolutely.

and national origin, but it did not extend its protection to state employees. *Fitzpatrick*, 427 U.S. at 449. In 1972, after extensive hearings, Congress amended Title VII's definition of a "person" subject to suit to include "governments, governmental agencies, [and] political subdivisions," but also amended Title VII's definition of "employee" to exclude political appointees as potential plaintiffs. Pub. L. 92-261 § 2(1), (5), 86 Stat. 103, codified at 42 U.S.C. § 2000e(a), (f). The net effect of these amendments was to allow all public employees, except for elected officers and their political appointees, to sue governmental entities for employment discrimination under Title VII.

Two decades later, Congress enacted the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071. Title I of the Act, entitled "Federal Civil Rights Remedies," amended various provisions of federal law, including Title VII and 42 U.S.C. §§ 1981 and 1988. Title III of the act, entitled the "Government Employee Rights Act of 1991" (GERA), created a new, self-contained act to "provide procedures to protect the right of Senate and other government employees," § 301(b), which was subsequently codified as part of Title 2 of the United States Code (statutes relating to Congress). Nothing in Title III (GERA) amended the Civil Rights Act of 1964. Congress could have easily extended Title VII to state and local political employees by amending Title VII to eliminate the exclusion of political appointees from the definition of "person" subject to protection from discrimination. *See* 42 U.S.C. § 2000e(f). Congress knew how to amend Title VII, and did so in Title I of the Civil Rights Act of 1991, *see* 105 Stat. 1074 (expressly amending Title VII). But Congress chose not to do so in GERA. Accordingly, *Fitzpatrick* does not control our abrogation analysis.

IV

*Atascadero* and *Dellmuth* instruct us that we cannot infer a congressional intent to abrogate state sovereign immunity

simply because the states are logically included within the set of potential defendants. GERA does not expressly abrogate state sovereign immunity, either directly or by reference. Nor does GERA limit its universe of possible defendants to the states alone. Because the text of GERA does not meet the high threshold set by the Supreme Court's clear-statement rule in *Atascadero* and *Dellmuth*, I would hold Jones's and Ward's claims against Alaska barred by sovereign immunity and grant Alaska's petition for review. Therefore, I must respectfully dissent.