In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-2578

TRACEY TRIGILLO,

*Plaintiff-Appellant,*

*v.*

DONALD N. SNYDER, GEORGE DETELLA,
WALTER A. SMALL, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 3241—**Jeanne E. Scott,** *Judge.*

ARGUED MAY 12, 2008—DECIDED OCTOBER 31, 2008

Before ROVNER, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Tracy Trigillo, the manager of procurement at the Illinois Department of Corrections, disagreed with some of the department's procurement practices. She raised her concerns to her supervisors, sought guidance from outside agencies, and even reported what she thought was misconduct to the FBI. But her disagreements with her supervisors proved more enduring than her job—when her term of employ-

ment expired, the department declined to renew it. After she was cut loose, Trigillo filed suit, claiming that she was terminated in retaliation for her statements regarding the department's purported misconduct. The district court (Judge Jeanne E. Scott) granted summary judgment to the various state defendants, and Trigillo appeals that decision.

In 1999, the Department of Corrections created a new "senior public service administrator" position dedicated to procurement matters. To fill the position it brought in Trigillo, who was working at the Illinois State Police. At first, there was some disagreement over her exact title, but the department eventually settled on calling her the manager of procurement. According to her official job description, Trigillo was to control the "purchasing, contracts, real estate leasing, commodity and property inventories" of the department. During her tenure, Trigillo drafted a description of her responsibilities, which included supervising the staff in the procurement section and overseeing approximately 60,000 transactions—everything from contracts securing health care for inmates to purchase agreements for mailroom equipment—that flowed through the department over the course of a year. Trigillo's job, which required a law license, entailed ensuring that contracts were properly bid and otherwise met the requirements of the then newly enacted Illinois Procurement Code, 30 ILL. COMP. STAT. 500/1-1 to /99-5, and other state and federal laws. As part of her job, Trigillo advised department officials about legal and regulatory issues and, for certain transactions, she recommended which vendor should be

awarded a contract. She was also the department's "primary liaison" with the Department of Central Management Services (CMS), a separate state agency that provides support to other entities regarding procurement issues.

Trigillo felt early on that some of the Department of Corrections' practices were not compliant with the code or the rules promulgated by CMS. She routinely communicated her concerns to her supervisors and to CMS officials, but her efforts to change the department's practices proved ineffective. Finally, in November 2000, she drafted a report to CMS and the Illinois attorney general, listing 13 concerns. According to its title, the report was written in compliance with the procurement code, which required state employees who suspect any collusion (or other anticompetitive practices) to inform the attorney general and (in most cases) the director of CMS of their suspicions. *See* 30 ILL. COMP. STAT. 500/50-40. In her report, Trigillo addressed many of the policy disputes she had with her supervisors. She also reported some potential misconduct within the department, including the leaking of confidential information to vendors during a bidding process. Trigillo, however, explained that she was making no "criminal or other accusations," but rather she identified these potentially "unfair or otherwise unwise" decisions so that CMS and the attorney general could provide the department with "guidance" going forward. A CMS official investigated the report and testified in his deposition that most of the issues raised by Trigillo did not merit intervention.

During her stint at the department, Trigillo also got wind of what she considered even more nefarious misconduct. In the spring of 2000, one of Trigillo's staff members told her that department officials rigged the bidding process for a contract so a vendor connected to the governor would come out on top. The evidence of the improprieties was allegedly destroyed. This contract was formed before Trigillo began working for the department, but she did oversee its extension during her tenure. Trigillo was alarmed by the allegation, and although she was not convinced of its veracity, she reported the potential misconduct to the FBI. Trigillo explained in her deposition that she made this report pursuant to her "duty as a citizen," as well as her "duty as chief of procurement." An FBI agent came to investigate the allegations the same day that Trigillo made her report. Trigillo never told her supervisors that she made the report to the FBI, and the record does not reflect the result of this investigation.

Trigillo was a term employee, and her term was up for renewal in November 2001. Although her supervisors consistently evaluated her performance as acceptable, the department chose not to renew her term. In reaching this decision, Trigillo's supervisor questioned her loyalty to the department, claimed that her interpretation and application of the procurement code was "over zealous," and noted that she was not "a team player."

Suspecting that she was fired in retaliation for her reports of departmental misconduct to CMS and the FBI, Trigillo filed suit under 42 U.S.C. § 1983. The district court, in a decision that predates *Garcetti v. Ceballos*, 547

U.S. 410 (2006), granted summary judgment in the defendants' favor. The court divided Trigillo's speech into three categories: (1) her routine communications with her supervisors and CMS officials; (2) her report to the attorney general and CMS made pursuant to the procurement code; and (3) her report to the FBI. The court concluded that Trigillo's routine communications with department and CMS officials were made pursuant to her regular job duties, and not as a citizen speaking on matters of public concern. The court went on to conclude that her report to the attorney general and CMS raised some issues of public concern—like the leaking of confidential information during the bidding process—but it ultimately concluded that Trigillo's interest as a citizen revealing such misconduct was outweighed by the department's interest in operating efficiently. The court noted that the report was dominated by policy disputes and concluded that the department was entitled to require Trigillo to loyally espouse its positions. Lastly, while the court held that Trigillo's report to the FBI was protected speech, it concluded that Trigillo failed to present evidence that her supervisors knew she had made the report.

Shortly after summary judgment was granted, the Supreme Court decided *Garcetti*, which reaffirmed that the First Amendment "limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." 547 U.S. at 419. However, the court emphasized that "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

Our task, then, is to determine whether Trigillo spoke as a citizen whistle-blower or a public employee just doing her job. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (*Spiegla II*). Trigillo concedes that some of her speech—the routine e-mails, memoranda, and conversations she had with her supervisors and CMS officials—fell within the scope of her official duties. But she maintains that she made two statements that merit constitutional protection: (1) the report she wrote and submitted to the attorney general and the director of CMS pursuant to the procurement code; and (2) the report she made to the FBI.

Trigillo argues that both reports went beyond her normal day-to-day duties and, therefore, they were entitled to protection under the First Amendment. But this argument has already been rejected. Before *Garcetti*, we held that speech consistent with an employee's general duties, but not part of her "core functions," deserved constitutional protection. *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir. 2004) (*Spiegla I*). But *Garcetti* required us to abandon this proposition, and we have acknowledged that the focus on an employee's core job functions is too narrow. *Spiegla II*, 481 F.3d at 966. Instead, *Garcetti* requires a practical inquiry into whether an employee's expression was made pursuant to her official obligations, including both her day-to-day duties and her more

general responsibilities. *Vose v. Kliment,* 506 F.3d 565, 570-71 (7th Cir. 2007) (concluding that a police officer's report about misconduct in a different unit, while "above and beyond his routine duties," was still within his official duties); *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007) (concluding that speech was pursuant to employee's official duties, "even if not explicitly required as part of her day-to-day job[.]"); *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 761 n.6 (11th Cir. 2006) ("The issue in *Garcetti* was whether a public employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions.").

But just as an employee's official duties should not be defined too narrowly, they should not be defined too broadly. *Garcetti*, 547 U.S. at 424-25. The defendants contend that Trigillo's report to the attorney general and CMS was made pursuant to her official duties because she wrote it to comply with her statutory duty to report anticompetitive practices. A statute or regulation can help determine the scope of an employee's duties to the extent that it creates responsibilities for that employee's specific job. *See Wilburn v. Robinson*, 480 F.3d 1140, 1150-51 (D.C. Cir. 2007) (looking to statutory definition of employee's authority to define scope of her duties). But that is not the case here. The Illinois Procurement Code is broad, requiring vendors, bidders, contractors, and all state employees—from the frontline correctional officer to the director of the department—to report their suspicions of anticompetitive practices. 30 ILL. COMP. STAT. 500/50-40. The statute does identify certain employees—such as a "State purchasing officer," or an

"elected official"—who must make such reports, but Trigillo's position is not included in the list.[1] *Id*. Her statutory obligation to report stems not from her job as manager of procurement, but from the fact that she, like thousands of others, received her paycheck from the state of Illinois. Such a broadly applicable legal duty says little about Trigillo's duties as the manager of procurement. To define Trigillo's official duties, we must do more than look to general statutes. Our task is a practical one that requires a close look at the statements made by Trigillo and the expectations and responsibilities that came with her job.

To that end, we turn to Trigillo's report to the Illinois attorney general and the director of CMS. In that report, while Trigillo did flag potential misconduct within the Department of Corrections, she began by stating that she was making no "criminal or other accusations." Instead, by contacting these outside agencies, she sought

---

[1] There is some dispute regarding Trigillo's title at the department. Trigillo occasionally identified herself as the "State Purchasing Officer Designee," and the procurement code specifically requires the designee to report her suspicions of anticompetitive practices. 30 ILL. COMP. STAT. 500/50-40. But according to Trigillo's official job description, she was the manager of procurement, and her supervisor, who was the state purchasing officer, testified during his deposition that he never authorized Trigillo to act generally as his designee. At this stage, we construe the facts in the light most favorable to Trigillo, *see Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006), and analyze her claim according to her official title of manager of procurement.

"formal guidance" regarding certain procurement matters, aiming to achieve, as she put it, a "better knowledge and understanding of the Procurement processes." As the manager of procurement, it was Trigillo's job to ensure that the many transactions that went through the department were properly bid and otherwise met the requirements of the Illinois Procurement Code and other applicable laws. Trigillo's report—written on department letterhead and signed by her as "Chief of Procurement"—sought assurance that the Department of Corrections was proceeding appropriately, and thus falls squarely within her official job responsibilities. At the end of the report she even offered her resources as the manager of procurement, including access to the department's records and the assistance of her staff in any investigation. Because the report was a means to fulfill Trigillo's obligation to oversee the department's procurement transactions, it is not protected by the First Amendment.

Finally, we consider Trigillo's claim that her term of employment was not renewed in retaliation for her reporting to the FBI that a contract (the "Comguard Contract"), approved before she joined the department, may have been issued because someone rigged the bidding process. Trigillo (and several others) heard about the alleged improprieties in the Comguard Contract from a staffer named Dave Dankoski. At her deposition, Trigillo explained why she reported the matter to the FBI:

> Well, a duty as a citizen, a duty as chief of procurement, you know, as lawyers we're supposed to be keepers of the state's coffers. So I felt I had several

duties. But I also didn't want to lose my law license over continuing a contract that maybe should or shouldn't have been done. And I had no way of knowing whether it should or not. I wasn't there originally. I don't know if anything Dave Dankoski said was true or false. Better to put it into proper hands and let them look at it and see.

It may well be that reporting Dankoski's "tip" to the FBI without investigation on Trigillo's part to see if there was any truth to it was an act of questionable judgment.[2] But we need not get into that because her retaliation claim based on the report to the FBI fails for a more basic reason: Trigillo presented no competent evidence that the decisionmaker (the department's director) who elected not to renew her for another term knew (or even thought) that she was the person who called in the FBI. In fact, Trigillo admitted that she never acknowledged that she made the report. With this indispensable link clearly missing, the district court was correct when it entered summary judgment for the defendants on this claim.

For these reasons, the judgment of the district court is AFFIRMED.

---

[2] Interestingly, the FBI agent who quickly responded and turned the office upside down by removing boxes from Dankoski's office was someone Trigillo had known "since they were kids."