In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3343

ROGER FAIRLEY and RICHARD GACKOWSKI,

*Plaintiffs-Appellants*,

*v.*

DENNIS ANDREWS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 5207—**Amy J. St. Eve**, *Judge*.

ARGUED MAY 6, 2009—DECIDED AUGUST 20, 2009

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Roger Fairley and Richard Gackowski worked as guards at the Cook County Jail in Chicago. After their peers threatened to kill them, they quit and sued the other guards, complaint handlers, the sheriff, and the County. (In saying that death threats were made, and throughout the opinion, we present the evidence in the light most favorable to plaintiffs. Defendants deny many of plaintiffs' principal contentions.)

Guards at the Jail regularly beat prisoners without justification. The harm plaintiffs complain of, however, is not the injuries suffered by prisoners but how other guards reacted when plaintiffs opposed the maltreatment. For example, in April 2000 Gackowski objected when Fred Coffey struck inmate Brown. Gackowski followed up with an internal complaint. Coffey and other guards responded by taunting Gackowski, calling him a "snitch" who "had no heart."

Four months later a fight broke out in Special Incarceration Unit 2, which holds the Jail's most dangerous inmates. After the prisoners had been subdued and shackled, guards Evan Fermaint, Noberto Bercasio, and Edward Byrne beat them. Fairley told them to stop. Byrne snapped: "They want to hurt my officers. . . . [K]ill 'em. They deserve to die." Byrne later told Gackowski (who had not seen the altercation) that he had twisted and jumped on an inmate's leg but couldn't get the bones to break. Byrne told Fairley not to file an incident report. Bercasio and Fermaint tagged Fairley "inmate lover."

Though the Department of Corrections' General Orders require guards to report any misconduct by their peers, plaintiffs say that this does not reflect reality; according to them, the Jail's real rule is a ban on reporting misconduct—a "code of silence." At the training academy, instructors told cadets to stick together and "don't say any bad remarks about anybody." This attitude pervaded the Jail.

Tensions mounted when the inmates involved in the incident in Special Incarceration Unit 2 filed suit. *Fields*

*v. Byrne*, No. 00 L 9339 (Cir. Ct. Cook County filed Aug. 16, 2000). Fairley and Gackowski told other guards that, if subpoenaed, they would tell the truth about what they had seen and heard. Fields's lawyer sent an investigator to Fairley's home, but Fairley said he hadn't seen anything. Fairley informed his superiors about the visit. They obtained a court order restricting Fields's access to guards and told the guards not to talk to anyone about what happened.

Plaintiffs' willingness to testify in *Fields* infuriated the other guards. Bercasio and Fermaint forcefully "dry humped" plaintiffs by grabbing them from behind and simulating anal intercourse. Bercasio posted on the Jail's bulletin boards pornographic cartoons featuring Gackowski. Supervisors repeatedly assigned plaintiffs to Special Incarceration Unit 2 without adequate supplies; other guards refused to let them out to use the restroom. Byrne denied Fairley's request for paternity leave and refused to pay plaintiffs for overtime they had worked. The taunts "inmate lover" and "social worker" flew freely.

Gackowski submitted an internal-affairs complaint about the bullying in August 2002, two years after *Fields* was filed. In December Fields served a subpoena on Fairley. Later that month inmate Lipscomb attacked Fairley with a shank, cutting him on the wrist. Bercasio remarked: "You see that, Fairley? You fuck with people, that's how you get stabbed." (Plaintiffs do not allege that guards furnished Lipscomb with the shank.) Internal investigators dragged their heels. Ronald Prohaska told

Gackowski, "[I]f Fairley goes into court on this SI-2 case . . . and tells the truth, he will fuck everyone involved. . . . We always knew he was a weak link and when a weak link can fuck everyone in the chain, then we have to bury the weak link. It's nothing personal. It's just business. . . . Just like with your complaint trying to fuck fellow officers."

Fearing further attacks, plaintiffs used all accrued leave time and then quit on February 4, 2003. Fairley had given his deposition in *Fields* a few weeks earlier; Gackowski was deposed in mid-February. Both testified at trial. The jury returned a defense verdict.

Fairley and Gackowski seek relief under 42 U.S.C. §1983. They contend that defendants violated their speech rights by assaulting and threatening them for reporting abuse to Jail supervisors and for their willingness to testify truthfully in *Fields*. They also contend some of the defendants violated their rights by preventing their complaints from moving up the chain of command.

Before reaching the merits we must address appellate jurisdiction. Shortly before trial was to begin, the court granted a motion to exclude all evidence of events that took place before Fairley and Gackowski gave their depositions. 2007 U.S. Dist. LEXIS 70539 (N.D. Ill. Sept. 24, 2007) (denying plaintiffs' motion for reconsideration). Plaintiffs call their theory "retaliation"—we'll consider later whether that's a helpful word—and the district judge believed that "retaliation" must follow protected speech. Because effects can't precede their causes, everything before the depositions must be irrelevant. (The

district judge had already dismissed the claim alleging punishment for filing internal complaints.) Plaintiffs contested this decision but acknowledged that, given the ruling, they could not prove their case, since the assaults and threats all occurred before the depositions. The judge responded: "[I]f you are still saying that you concede that you cannot prove causation in your case based on the Court's rulings, then I will grant judgment for the defendants on that issue, and you can take it all up to the Seventh Circuit."

Oddly, the court's docket entry states that plaintiffs' response to defendants' motion for summary judgment "is converted to a motion by Plaintiff [to] dismiss." (A docket entry is an improper substitute for a judgment. Fed. R. Civ. P. 58 requires a document separate from the statement of reasons supporting the relief granted in the judgment.) Defendants seize on this language, arguing that it shows that the court dismissed the case pursuant to Fed. R. Civ. P. 41(a)(1) (voluntary dismissal by the plaintiff). And defendants read cases such as *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001), to bar appeals from actions terminated under Rule 41(a)(1).

Defendants are mistaken. The only prerequisites to appellate jurisdiction are a final judgment and a timely notice of appeal. 28 U.S.C. §1291. Whether a party consented to that judgment (and which particular rule of civil procedure the district court invoked) is irrelevant. *McMillian v. Sheraton Chicago Hotel & Towers*, 567 F.3d 839 (7th Cir. 2009); *Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675 (7th Cir. 2001). The judgment here is final and the notice timely, so we have jurisdiction.

That said, if plaintiffs consented to the entry of judgment against them, we must affirm. Litigants aren't aggrieved when the judge does what they want. *Nashville, Chattanooga & St. Louis Ry. v. United States*, 113 U.S. 261 (1885). Plaintiffs contend that they accepted dismissal as inevitable only after the district court gutted their case. This matches the district judge's description. Cf. *Katz v. Gerardi*, 552 F.3d 558, 563 (7th Cir. 2009). Acknowledging that a case is hopeless, given a prior ruling (which the party believes to be unsound), is a far cry from abandoning the suit. *McMillian* and *Downey* hold that a party who asks for a final judgment in order to appeal an antecedent ruling is entitled to contest the merits of that issue on appeal. *Chavez* illustrates this principle. After the district court dismissed some of plaintiffs' claims, they requested the entry of judgment against them. We reviewed claims rejected by the court but refused to consider claims that were still live when plaintiffs asked for judgment. The rule is simple: if plaintiff loses on A and abandons B in order to make the judgment final and thus obtain immediate review, the court will consider A, but B is lost forever. See also *Pollution Control Industries of America, Inc. v. Van Gundy*, 979 F.2d 1271 (7th Cir. 1992).

On to the merits. Fairley and Gackowski present two theories of recovery under the first amendment: first, that defendants punished them for defying the code of silence by reporting fellow guards' misconduct; second, that defendants bullied them to keep them from testifying in *Fields*.

*Garcetti v. Ceballos*, 547 U.S. 410 (2006), holds that the first amendment does not protect statements made as

part of one's job. Ceballos, a deputy district attorney, discovered what he believed were material misrepresentations in an affidavit that had been used to support a search warrant. He wrote a memo to his superior suggesting that the case be dismissed. When the supervisor disagreed, Ceballos pressed his view. The supervisor responded by transferring Ceballos to another office and refusing to promote him; Ceballos sued. The ninth circuit concluded that the first amendment applies to speech that is part of a worker's responsibilities. *Ceballos v. Garcetti*, 361 F.3d 1168, 1174–75 (9th Cir. 2004). The Justices reversed, holding that the first amendment does not regulate the way in which a public employee's job is performed. The Constitution does not restrict a public employer's ability to manage the workplace, whether the bureaucracy's tasks entail speech or action.

The Jail's General Orders thus pose a problem for plaintiffs' first theory. Since the General Orders require guards to report misconduct by their colleagues, the guards' reports are not part of the freedom of speech—and how the sheriff responds is a question for statutes, regulations, and wise management rather than the Constitution. Ceballos reported that his co-workers had likely broken the law; his superior thought that the memo displayed bad judgment and acted accordingly. See also *Vose v. Kliment*, 506 F.3d 565 (7th Cir. 2007). So here, plaintiffs reported what they deemed illegal conduct by co-workers, and that speech is not protected.

Plaintiffs try to avoid *Garcetti* by arguing that the Jail's actual rule is the opposite of what's in the manual: a

guard must *not* report a co-worker's misconduct. Since they did not have an official duty to complain, *Garcetti* is inapplicable, plaintiffs maintain. (Another reason they advance this "code of silence" theory is to establish that the Jail has an official policy of punishing guards who speak out. See *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). In response, the sheriff has agreed to accept liability if any of the guards is found liable; this does not affect analysis under *Garcetti*.)

*Alaska v. EEOC*, 564 F.3d 1062 (9th Cir. 2009) (en banc), supports plaintiffs' position. Lydia Jones, an aide to the Governor of Alaska, asserted that she had been sexually harassed at work. A second aide, Margaret Ward, corroborated the accusations in a workplace interview and press conference. The governor fired both of them. The ninth circuit held that *Garcetti* does not apply unless the employer has officially assigned to the employee a task of making *particular* speech, requiring the worker to act precisely as she did. Because Ward had not been commanded to file internal complaints or issue press releases, her suit could go forward. *Id.* at 1070–71 & n.7.

Yet *Garcetti* is not limited to tasks officially assigned to an employee. Ceballos himself did not have a duty to make the report, or include the accusations, that got him into trouble; communicating with his superiors was simply within the general ambit of his job. The Justices have distinguished between public and private speech by asking about the employer's real rules and expectations, not just official requirements contained in a manual or formal directive. *Garcetti*, 547 U.S. at 424–25. See

also *Alaska*, 564 F.3d at 1074–76 (O'Scannlain, J., dissenting). See also *Riley v. Blagojevich*, 425 F.3d 357 (7th Cir. 2005) (explaining why written job descriptions are not conclusive for identifying policy-making or discretionary jobs for which politics are an appropriate consideration).

*Garcetti* applies to job requirements that limit, as well as those that require, speech. Suppose the Jail put a guard in charge of maintaining a bulletin board, instructing him to post only materials that relate to workplace safety. If the guard puts up something on a different topic, or fails to put up anything, the management may discipline the guard without encountering an objection under the first amendment. See *Guardian Industries Corp. v. NLRB*, 49 F.3d 317, 319–20 (7th Cir. 1995); cf. *Mayer v. Monroe County Community School Corp.*, 474 F.3d 477 (7th Cir. 2007) (school may discipline teacher for conducting an anti-war demonstration during class time).

And *Garcetti* can't be limited to "good" workplace requirements, as the ninth circuit supposed in *Alaska*. Ceballos was fired for reporting conduct that he believed was illegal. The Justices did not praise the district attorney's response; they held instead that state law rather than the federal Constitution determines whether a public work force is being well managed. If an employer has instructed the workers to keep their mouths shut during working hours on questions related to performance of their (and co-workers') jobs, the first amendment does not prevent the employer from enforcing that requirement. Whistle-blower protection

statutes or labor law might provide a remedy (particularly if an employee is punished for reporting illegal acts), but the Constitution does not.

The purported code of silence is a ban on filing complaints about guard-on-inmate violence. Such a policy might be foolish; it might expose the County to other lawsuits; but it does not offend the first amendment, because what one guard says about another through the grievance system is part of the job, and the employer can discipline a guard for poor performance of work-related tasks. See *Mayer*, 474 F.3d at 479. Compare *Garcetti* with *Rankin v. McPherson*, 483 U.S. 378 (1987), and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979). We disapprove *Alaska v. EEOC* to the extent that decision rests on a belief that *Garcetti* applies only to speech expressly commanded by an employer. See also *Winder v. Erste*, 566 F.3d 209 (D.C. Cir. 2009); *Haynes v. Circleville*, 474 F.3d 357 (6th Cir. 2007); *Thomas v. Blanchard*, 548 F.3d 1317 (10th Cir. 2008); *Abdur-Rahman v. Walker*, 567 F.3d 1278 (11th Cir. 2009).

Bercasio, Fermaint, and the other guards are not plaintiffs' employer, however. Whether *Garcetti* protects their actions is a novel question. To recover under the first amendment, a plaintiff must prove, among other things, both that his speech was "protected" and that the government's (more accurately, a given state actor's) justification for curtailing the speech was inadequate. *Garcetti* appears to address the first question, but its reasoning focuses on the justification of a particular defendant: the government employer. Thus it is conceiv-

able that the Court might hold the same speech "not protected" vis-à-vis the employer, but "protected" vis-à-vis co-workers.

This case illustrates the importance of properly characterizing *Garcetti*'s holding. If plaintiffs' speech is categorically not protected, any state actor can punish plaintiffs in any way he wishes without incurring liability under the first amendment. But if the Justices instead dealt with the justification of a particular state actor, the acts of one defendant (the sheriff) might be justified, while the acts of others (fellow guards) might not, for guards cannot assert the same interest in maintaining smooth operations as the Jail's administrators. Imagine that Cook County's in-house counsel, furious about the snitching, beat up Fairley after work. Why should the County's need for flexibility in running its Jail insulate the actions of all state actors? Though we have treated *Garcetti* as dealing with the question whether speech is protected, see, e.g., *Chaklos v. Stevens*, 560 F.3d 705, 711–12 (7th Cir. 2009); *Renken v. Gregory*, 541 F.3d 769, 773–75 (7th Cir. 2008), we have never considered how it applies to a non-employer.

Unfortunately for Fairley and Gackowski, their *Monell* argument—that the Jail has a policy forbidding complaints about guards who abuse inmates—links the guards' fates to the sheriff's. If a code of silence is the rule, then the guards were merely enforcing the Jail's policy. Although the guards' conduct might have been tortious or even criminal, see 720 ILCS 5/32-4 (witness tampering), plaintiffs do not want tort damages. They have framed

their case in a way that can yield one of only two results: either everyone is liable under the first amendment or no one is liable. Since the first amendment does not support a claim against the sheriff, all defendants win.

Fairley and Gackowski might have contended that the General Orders, rather than an unwritten code of silence, were the official rule. As this argument would go, some guards set out to violate the Orders by punishing anyone who informs on another guard. The Jail's employment policies would be out of the picture, and we would have to decide whether *Garcetti* shields non-employer state actors who try to subvert the employer's policies. But plaintiffs argue only the inverse—that the Jail's policy is silence, and that guards enforce this through threats condoned, if not commanded, by management—so this theory is off the table. We reserve the question how *Garcetti* applies to punishments meted out by non-employers. (We emphasize that we express no opinion on the legality of defendants' conduct. We merely reject the argument that prohibiting guards from complaining to supervisors violates the first amendment.)

Plaintiffs' second theory is that they were bullied and threatened in order to deter them from testifying in *Fields*. This claim falls outside *Garcetti*. The Jail likely requires guards to testify on its behalf and pays them for time at court. Testifying against the Jail might not be part of the job, but that doesn't matter. Even if offering (adverse) testimony is a job duty, courts rather than employers are entitled to supervise the process. A government cannot tell its employees what to say in court, see

18 U.S.C. §1512, nor can it prevent them from testifying against it.

Defendants' only contention is that no one "retaliated" against plaintiffs for testifying, because the insults, assaults, and threats all preceded plaintiffs' depositions in *Fields*. This misapprehends the nature of plaintiffs' claim. The Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment. Penalties that follow speech are forbidden. This includes, but certainly is not limited to, reactions to what has already been said. E.g., *Milwaukee Deputy Sheriff's Association v. Clarke*, No. 08-3298 (7th Cir. July 21, 2009); *Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004); *Ridpath v. Marshall University*, 447 F.3d 292, 319–20 (4th Cir. 2006). (Of course, the sanction or threat must be serious enough to deter an ordinary person from speaking. *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982).) But threats of penalties also are forbidden. That's why it can be misleading to speak of "retaliation" as the basis of a suit. The word implies that threats don't matter, and the district court here was misled.

Threatening penalties for future speech goes by the name "prior restraint," and a prior restraint is the quintessential first-amendment violation. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559 (1976) (judicial gag order); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–53 (1975) (executive censorship). Indeed, for a time it appeared that prior restraints were the only actions forbidden by the first amendment. See *Schenck v. United States*, 249 U.S. 47 (1919). Later cases have held that penal-

ties for completed speech also violate the Constitution, but this development does not suggest that only post-speech penalties now matter.

The word "retaliation" has the potential, realized here, to divert attention from the rule that both threats designed to deter future speech and penalties for past speech are forbidden. "Retaliation" as a legal theory comes from employment-discrimination suits. See, e.g., 31 U.S.C. §3730(h); 42 U.S.C. §12203. We have borrowed the word in cases where an employer punishes an employee on account of speech. E.g., *Chaklos*, 560 F.3d at 711. Using one word for two kinds of claim has the potential to confuse. Cf. *Krolnik v. Prudential Insurance Co. of America*, 570 F.3d 841 (7th Cir. 2009). Because only a subset of viable first-amendment claims involves retaliatory discharge, it is generally best to avoid the word.

The first amendment protects speakers from threats of punishment that are designed to discourage future speech. Fairley and Gackowski can recover from any defendants who made such threats—though there are two additional requirements.

One is proof of causation. Plaintiffs must show that their potential testimony, not their internal complaints, caused the assaults and threats. This means but-for causation. See *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009); *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274 (1977). Some decisions (*Matrisciano v. Randle*, 569 F.3d 723 (7th Cir. 2009), is the latest) say that a plaintiff just needs to show that his speech was a motivating factor in defendant's

decision. These decisions do not survive *Gross*, which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law. The record has evidence from which a reasonable jury could find causation; no more is necessary at this stage, but the instructions at trial must reflect the holding of *Gross*.

The second requirement is proof of damages. The largest item will be lost income, if plaintiffs can establish that the threats caused them to quit. Cf. *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). Lesser threats, defamation, and battery (the dry humping) also can lead to damages, if these are the sort of harms that would cause a reasonable person to keep quiet. *Bart*, 677 F.2d at 625. But because *Garcetti* covers the intra-Jail complaints, actions that occurred before the altercation in Special Incarceration Unit 2, such as the taunting that followed Gackowski's defense of inmate Brown, are not an appropriate source of damages.

One final observation. Plaintiffs pleaded a conspiracy claim under 42 U.S.C. §1985(3), but it's superfluous. The function of §1985(3) is to permit recovery from a private actor who has conspired with state actors. See *Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). All defendants are state actors, so a §1985(3) claim does not add anything except needless complexity. Plaintiffs appear to think that the §1985(3) claim expands the scope of admissible evidence. But Fed. R. Evid. 801(d)(2)(E) (statement of coconspirator is not

hearsay) applies whether or not the defendants are formally charged with a conspiracy. The rule making one conspirator's statements admissible against another rests on a theory of agency, not on the allegations in the complaint. If plaintiffs can show that the defendants acted in concert, then Rule 801(d)(2)(E) will apply. And the judge, not the jury, makes this decision. See Fed. R. Evid. 104(a); *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990) (en banc).

The judgment is affirmed to the extent that the district court dismissed plaintiffs' "code of silence" claim and the conspiracy claim. To the extent that it dismissed the prior-restraint claim, the judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.