NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0120n.06

Nos. 14-3038/-3064

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PAGE PLUS OF ATLANTA, INC. and SNAP PREPAID, LLC,

      Plaintiffs-Appellants/Cross-Appellees,

v.

OWL WIRELESS, LLC,

      Defendant-Appellee/Cross-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Feb 10, 2015
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

Before: SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Page Plus distributed prepaid cellular phones and minutes for Owl Wireless. In 2008, Page Plus and Owl signed a distribution contract that set prices on those products and defined Page Plus's distribution territory. Page Plus alleges it later assigned its rights under the contract to SNAP Prepaid. SNAP sued Owl in 2011, alleging that Owl had charged it prices in excess of those promised in the distribution contract. Owl responded with counterclaims against SNAP and Page Plus, alleging that one or both of them had sold to customers to which Owl had exclusive sales rights.

The district court eventually granted summary judgment sua sponte to Owl on SNAP's contract claim. SNAP now challenges that grant on both procedural and substantive grounds. SNAP and Page Plus also challenge the court's interpretation of contract language relevant to

Owl's counterclaims—claims that Owl voluntarily dismissed. We affirm the judgment, and dismiss No. 14-3038 to the extent it raises issues relevant only to Owl's counterclaims.

I.

Owl sells prepaid cell phones and minutes for those phones—either in the form of phone cards or electronic PIN numbers—to multiple distributors. In October 2008, Owl signed a two-year contract with the distributor Page Plus. The contract set prices on certain phones, phone cards, and PIN numbers; guaranteed Page Plus the best available prices on those products; and required Owl to apply "price change[s]" on those products "to all of [its] other distributors[.]" The contract also required Page Plus to transfer the accounts for two of its largest customers— Blackstone and Budget—to Owl.

Shortly thereafter, Page Plus's owner, Steve Harris, and its top executive, Michael Lizdas, formed SNAP, each taking an ownership share in the new company. What happened next is disputed: Lizdas and Harris say they had "multiple conversations" during which the men orally assigned Page Plus's contract rights to SNAP. But Lizdas and Harris undisputedly never wrote down their agreement, or made a general announcement to their employees, or told Owl's executives about the assignment—which allegedly took effect on January 1, 2009.

Within two months of that date, SNAP made its first of many sales to Blackstone. Several months later, SNAP began selling cellular minutes to Budget. These sales eventually totaled more than $22 million. Meanwhile, in September 2009, Owl increased the price charged to SNAP for phone cards from 77% of their face value to 78%. Owl's other distributors that bought phone cards at the 77% mark also saw a 1% increase. But Owl did not change the prices charged to some distributors paying more than 77%, thereby reducing SNAP's pricing advantage over those distributors.

In 2010, Page Plus sued Owl for breach of contract. In a verified complaint, Page Plus (rather than SNAP) alleged that Owl had breached the contract by reducing the differential between the prices charged to Page Plus and those charged to other distributors. Owl answered that Page Plus had breached the contract by selling to Blackstone and Budget. More than a year into litigation, however, Page Plus apparently figured out that SNAP, rather than Page Plus, had made all of the purchases that were the basis of Page Plus's breach of contract claim. Page Plus, therefore, moved for leave to add SNAP as a party to the case. The district court denied the motion, and in a stipulated order dismissed the complaint without prejudice.

Three weeks later, Page Plus and SNAP brought this lawsuit, which asserted the same claims Page Plus had asserted in the prior suit, but added SNAP as a party. Owl again asserted its counterclaims. For the first time, however, the plaintiffs alleged that Page Plus had assigned its contract to SNAP on January 1, 2009. SNAP therefore asserted the price-differential claim instead of Page Plus; and Owl alleged that one or both plaintiffs, not Page Plus alone, had breached the contract.

On cross-motions for summary judgment, the district court held that both sides had breached the contract: Owl by raising the prices charged to SNAP, and one or both plaintiffs by selling to Blackstone and Budget. But the court left the issue of damages for a jury to decide. Each side thereafter filed motions in limine to preclude the other from producing any evidence of damages. Specifically, Owl moved to exclude such evidence on the ground that SNAP had not become a party to the contract through a valid assignment. In August 2012, the court denied the motion—observing that it was "almost a summary judgment request."

But the court soon revisited the alleged assignment. On September 14, the court requested supplemental briefing on the "legal significance of Page Plus's alleged assignment to

Snap[.]" On October 5, the court held a phone conference during which the court said that it would "determine whether the issue [i.e., whether Page Plus had assigned its contract rights to SNAP] is appropriate for trial." The parties each "agreed the record [was] complete" on whether a valid assignment had occurred. Five days after the conference, however, SNAP and Page Plus filed a declaration and financial records in an attempt to shore up their allegation that Page Plus had assigned its contract rights to SNAP. The district court was unpersuaded, and thereafter sua sponte granted summary judgment to Owl on SNAP's contract claim, holding that SNAP had not presented enough evidence to create a genuine dispute of fact as to whether Page Plus had assigned its contract rights to SNAP. Owl then voluntarily dismissed its counterclaims, but reserved the right to reassert the claims if SNAP obtained reversal of any of the court's rulings.

Both sides then appealed. We dismissed those appeals for lack of jurisdiction, because the conditional nature of Owl's voluntary dismissal meant that the appeals were not from a "final decision[]" of the district court. *See* 28 U.S.C. § 1291. On remand, the parties stipulated to an order dismissing Owl's counterclaims without prejudice. These appeals followed.

II.

A.

1.

SNAP argues that the district court improperly granted summary judgment sua sponte, asserting that the district court "never gave notice that it planned to grant summary judgment[.]" Appellant Br. 33. A district court may grant summary judgment sua sponte after "giving notice and a reasonable time to respond[.]" Fed. R. Civ. P. 56(f). To determine whether a court gave adequate notice, we ask whether the losing party knew "that [it] had to muster the necessary facts to withstand summary judgment[.]" *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir.

2013) (citation omitted). We review a court's compliance with the notice requirement for an abuse of discretion. *Id.* at 828.

Two events are relevant here. The first is Owl's motion in limine. Despite its label, that motion—which asserted that Page Plus had not assigned its contract to SNAP—functioned as a motion for summary judgment. The parties understood as much: in a brief and at a hearing, SNAP argued that the assignment's existence was "a jury issue" for nearly the same reasons that SNAP now offers on appeal. Moreover, the parties knew that the motion, if granted, would prevent SNAP from proving that it had suffered damages—which is an essential element of a contract claim. *See Tidewater Fin. Co. v. Cowns*, 968 N.E.2d 59, 62 (Ohio Ct. App. 2011). Thus, by the time the district court granted summary judgment to Owl on the ground that SNAP lacked evidence of an assignment, the parties had fully briefed that issue and knew full well its importance to this litigation.

Second, during the phone conference on October 5, the district court told the parties that it intended to "determine whether the [assignment] issue is appropriate for trial." The court's statement gave the parties unequivocal notice that the court might decide that SNAP had not presented evidence sufficient to create a genuine issue as to whether SNAP was an assignee under the contract—which everyone knew would defeat SNAP's claim. That SNAP knew that it needed to submit all of its evidence on that issue is made clear by SNAP's decision to submit additional documents five days after it had agreed with the district court that "the record [was] complete[.]"

The sua sponte nature of the district court's decision was, therefore, only nominal. And even if SNAP might legitimately claim to have been surprised by the district court's summary-judgment ruling, SNAP suffered no prejudice. SNAP presented all of its arguments and

evidence in its motion for reconsideration, and the district court duly considered them in denying the motion. The district court did not abuse its discretion in granting summary judgment when it did.

2.

SNAP challenges the basis of the district court's determination that SNAP did not present evidence creating a genuine issue as to whether Page Plus had assigned the contract to SNAP. We review that determination de novo. *Montell v. Diversified Clinical Services*, 757 F.3d 497, 503 (6th Cir. 2014).

The parties agree that Ohio law governs the question whether Page Plus assigned the contract to SNAP. An alleged assignee under a contract "must allege and prove the assignment" to bring a claim under the contract. *Zwick & Zwick v. Suburban Const. Co.*, 134 N.E.2d 733, 734 (Ohio Ct. App. 1956). For an assignment to be valid, the parties must intend to make one and exchange consideration. *Nee v. State Indus., Inc.*, 3 N.E.3d 1290, 1304-05 (Ohio Ct. App. 2013).

The district court held that SNAP had not presented evidence creating a genuine issue that Page Plus had assigned the contract to SNAP. *See generally Marie v. Am. Red Cross*, 771 F.3d 344, 351 (6th Cir. 2014). Specifically, the court observed that the conduct of SNAP and Page Plus "during the history of this litigation . . . supports the opposite conclusion—Page Plus did not believe it had assigned the [contract] to Snap." The court pointed out that Page Plus had filed a verified complaint alleging that Owl had injured Page Plus, not SNAP; that Lizdas had stated in an interrogatory answer that "Page Plus Atlanta, Inc. is the *only party* to the 2008 Distributor Agreement with Owl" (emphasis added); and that SNAP itself had not sought to assert a contract claim until more than a year into the earlier lawsuit.

But SNAP asserts that its evidence—primarily a handful of sworn statements from Lizdas, Harris, and an accountant—would allow a jury to find that an assignment had occurred. Both Lizdas and Harris testified in a conclusory fashion that, acting on behalf of Page Plus, they had orally assigned the contract to SNAP. But they offer no details whatsoever as to when or how, exactly, this assignment occurred. Meanwhile, even this conclusory assertion is contradicted by Lizdas's previous sworn statement in his interrogatory representing that Page Plus was the sole party to the contract with Owl. Likewise, the accountant's declaration—filed after the district court had granted summary judgment—says nothing about when or how Page Plus assigned its contract rights to SNAP.

SNAP also cites several emails suggesting that Owl thought itself obliged to deal with SNAP pursuant to the distribution contract. But Owl's executive vice-president, Yassine Yassine, thought that Page Plus had simply changed its name to SNAP. That understanding is consistent with an email from Lizdas saying that Owl had breached its contract with "Page Plus" months after the assignment supposedly took place. And in any event Owl's emails are not significant evidence of whether Page Plus intended to assign its own rights to SNAP.

Finally, SNAP points out that on one occasion Owl's bookkeeper asked SNAP to send Owl a W-9 form for "the new company[.]" But Owl made that request in response to a request by *SNAP* to change its name on purchase orders. That SNAP even cites this exchange is proof of how weak its case is.

In summary, to show that an assignment occurred, SNAP principally relies on conclusory assertions uncorroborated by other evidence and belied by its own litigation conduct. Its proofs are a thin gruel of circumstantial evidence insufficient to sustain this case through trial. The district court correctly granted summary judgment to Owl on SNAP's contract claim.

B.

SNAP and Page Plus also appeal a ruling—specifically, that the sales to Blackstone and Budget breached the contract—relevant only to counterclaims that Owl voluntarily dismissed with both sides' consent. With exceptions not relevant here, litigants may not appeal a favorable judgment or a judgment entered with their consent. *Fairley v. Andrews*, 578 F.3d 518, 521-22 (7th Cir. 2009); *ASARCO, Inc. v. Sec'y of Labor*, 206 F.3d 720, 722-23 (6th Cir. 2000). The judgment dismissing Owl's claims was favorable to SNAP, and SNAP indeed consented to that judgment. SNAP therefore cannot appeal rulings relevant only to claims dismissed by that judgment.

No. 14-3038 is dismissed to the extent it raises issues related to Owl's counterclaims, and the district court's judgment is affirmed. Owl's cross-appeal, No. 14-3064, is dismissed as moot.