In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2053

COMSYS, INC., and KATHRYNE L. MCAULIFFE,

*Plaintiffs-Appellees*,

*v.*

FRANK PACETTI, EDWARD ST. PETER, and KEITH G. BOSMAN,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 16-CV-655-JPS — **J.P. Stadtmueller**, *Judge*.

ARGUED MARCH 30, 2018 — DECIDED JUNE 20, 2018

Before EASTERBROOK and ROVNER, *Circuit Judges*, and GILBERT, *District Judge*.[*]

EASTERBROOK, *Circuit Judge*. The City of Kenosha, Wisconsin, hired Comsys to be its information-technology department. Comsys had its offices inside City Hall and stored all of its electronic information on the City's servers. The

---

[*] Of the Southern District of Illinois, sitting by designation.

contract between Comsys and the City automatically re-newed from year to year unless terminated, adding that both Comsys and the City "shall have the right, with or without cause, to terminate the Agreement by written notice deliv-ered to the other party at least twelve (12) calendar months prior to the specified effective date of such termination." The City's Common Council voted on June 2, 2014, to end the contract, and the City's Mayor (Keith G. Bosman) delivered formal notice two days later. The contract ended on June 5, 2015.

Comsys then sued everyone in sight—the City, the City's Water Utility (for which Comsys also had worked), the Mayor, the City Administrator (Frank Pacetti), the General Manager of the Water Utility (Edward St. Peter), the City's Director of Information Technology (Merril Kerkman, who moved from Comsys to the City on May 1, 2014), and every member of the Common Council who voted to terminate the contract. Comsys asserted that all defendants had violated the First and Fourth Amendments to the Constitution (ap-plied to these defendants through the Due Process Clause of the Fourteenth Amendment), and are liable under state con-tract and tort law to boot. The district court dismissed sever-al claims on the pleadings, 223 F. Supp. 3d 792 (E.D. Wis. 2016), and later dismissed the Council's members on the ground of legislative immunity. 2017 U.S. Dist. LEXIS 70518 (E.D. Wis. May 9, 2017). The May 2017 opinion also denied motions for summary judgment on the First and Fourth Amendment claims. Mayor Bosman, Administrator Pacetti, and Manager St. Peter have appealed from the order to the extent it rejected their argument for official immunity. See *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

The record (read favorably to Comsys) shows that after Kerkman was appointed as Chief Information Officer of Comsys at the beginning of 2013, Administrator Pacetti began to make plans to get rid of Comsys and take the work in-house, under Kerkman's direction. Kathryne McAuliffe, Comsys's CEO and sole owner, got wind of this plan, and hostilities ensued. Kerkman accessed some of McAuliffe's emails and passed information, which may have included trade secrets and other confidences, to Pacetti. While the Police Department was investigating Kerkman on an unrelated matter, McAuliffe told police about his unauthorized access of her emails. She later filed a criminal complaint against Kerkman and Pacetti, and the Sheriff's Office investigated her charges. In May 2014 the Sheriff's Office confiscated the City's servers on the authority of a search warrant. That step caused bad feelings as well as considerable difficulty in getting work done. Within days Mayor Bosman asked the Common Council to end the City's relation with Comsys. McAuliffe wrote to the Common Council, strongly objecting, but the Council sided with the Mayor.

Comsys and McAuliffe contend that the contract's termination violated the First Amendment by penalizing three episodes of speech. Plaintiffs call this "retaliation," but that word does not add anything to the basic claim that the City made protected speech costly by ending a contract that was profitable to Comsys. See *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

Trying to isolate contract administration from speech may be impossible. Even when a contractor serves at a city's pleasure, the deal is unlikely to be called off without some reason. Terminations follow breakdowns of relations. Dur-

ing a breakdown, charges and countercharges are likely; it is impossible to imagine the end to a relation such as the one between Comsys and the City without either side saying something to the other. Words may be harsh and the exchanges acrimonious. If that were enough to permit recovery under the Constitution, however, then the federal courts will have displaced state contract law and effectively nullified agreements allowing termination without cause.

Considerations of this kind led the Supreme Court to hold in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that a public employee cannot use the First Amendment to block (or get damages for) a discharge that follows things the worker said as part of the job. As the Court saw matters, the managers in a public office must be able to maintain discipline and assure that the office functions as elected officials wish. *Id*. at 422–23. The Justices concluded that a public employee is not speaking as a citizen, and therefore is not protected by the First Amendment, when speaking as part of the job.

Neither the Supreme Court nor the Seventh Circuit has considered whether the same principle applies to the administration of public contracts, but every circuit that has addressed the issue has given an affirmative answer. See *Decotiis v. Whittemore*, 635 F.3d 22, 26 n.1 (1st Cir. 2011); *Marez v. Bassett*, 595 F.3d 1068, 1074 (9th Cir. 2010); *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012). That conclusion is sound, especially when the contractor is acting as a *de facto* branch of a public body. Until 2015 Kenosha used a contract, rather than a civil-service system, to provide its information-technology needs. It should have as much freedom to manage that contractual relation as to manage an internal IT department.

*Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), and *O'Hare Truck Service, Inc. v. Northlake*, 518 U.S. 712 (1996), reinforce this conclusion. Those decisions hold that public contractors are treated just like public employees with respect to the rule against hiring and firing to carry out political patronage. If contractors and employees are alike in this constitutional respect, why not others? It is hard to see how there *could* be a difference; after all, the employment relation is itself a matter of contract under state law, which provides the tenure and conditions of public employment.

At least one aspect of the current suit can be resolved on the basis of the *Ceballos* principle. The day the Common Council was to vote on terminating the contract, McAuliffe sent it a letter accusing Kerkman (by then a City employee) and Pacetti of unseemly conduct. The letter's stated purpose was to provide the Council's members with "as much information as possible [as] they contemplate[d] options with [Comsys's] contracts." This letter spoke for Comsys as a contractor trying to keep business. True, the letter was not required by the contract, but it dealt with contract administration. If Ceballos, after being told that he was in hot water for what he had written on the job, had penned a letter to his managers protesting his impending discharge, he could not have used the letter's lack of success as the fulcrum of a First Amendment claim. Allowing that step would make *Ceballos* empty. Our decisions hold that internal memos protesting coworkers' misconduct are not protected by the First Amendment. *Forgue v. Chicago*, 873 F.3d 962, 966–67 (7th Cir. 2017); *Fairley*, 578 F.3d at 522. That understanding covers McAuliffe's letter as well.

Two other matters cannot be resolved on the basis of *Ceballos*. During the initial probe of Kerkman in winter 2014, McAuliffe met with an investigating officer and made statements adverse to him. Then in May 2014 McAuliffe filed a criminal complaint against Kerkman. Both of these steps may have affected the contract but did not occur as part of its administration. Statements given under oath at trial or before a grand jury fall outside the scope of *Ceballos*, because the "independent obligation [to tell the truth] renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014); see also *Chrzanowski v. Bianchi*, 725 F.3d 734, 740 (7th Cir. 2013); *Chaklos v. Stevens*, 560 F.3d 705 (7th Cir. 2009); *Fairley*, 578 F.3d at 524. McAuliffe's statements were not sworn, but neither were they part of her contractual duties.

Still, we recognize that *Trigillo v. Snyder*, 547 F.3d 826 (7th Cir. 2008), implies that McAuliffe's speech falls within the scope of *Ceballos*. *Trigillo* held that the plaintiff's reports of misconduct to external government officials, including the state's attorney general, were part of her employment duties and thus were not protected. *Id*. at 830. It is difficult to distinguish McAuliffe's complaint from the reports of misconduct in *Trigillo*. Doubtless the cases are technically distinguishable. McAuliffe reported misconduct at work, while Trigillo did that and also asked for guidance on how to address the misconduct; the latter request seems closer in spirit to *Ceballos*. Trigillo was her employer's manager of procurement, and she reported misconduct that affected procurement; the connection between Trigillo's job duties and her report thus seems stronger than the connection between McAuliffe's job duties and her complaint. On the other hand,

McAuliffe's statements seem designed to influence the per-
formance of the contract, which makes the situation look
more like *Ceballos*.

This means that we face a line-drawing problem. The law
does not clearly put McAuliffe's reports on either the pro-
tected or the unprotected side. The district judge recognized
as much, observing several times that it was necessary to
balance interests (the City's interest in having an efficient IT
operation versus McAuliffe's interest in protecting her busi-
ness and reporting someone she believed to be a thief of her
emails) to decide whether the First Amendment overrides
the City's position. 2017 U.S. Dist. Lexis 70518 at *23–24, 27.
See also *Pickering v. Board of Education*, 391 U.S. 563 (1968). To
say that the line between protected and unprotected speech
is so unclear that a judge must engage in after-the-fact bal-
ancing is practically to invite an immunity defense, for only
a violation of clearly established law permits an award of
damages. *White v. Pauly*, 137 S. Ct. 548 (2017).

It is not enough that the law be established at a high level
of generality (such as "protected speech must not be penal-
ized"); doctrine must dictate the resolution of the parties'
dispute. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). It follows
that, when case-specific balancing of interests is essential, the
law often is not clear enough to permit awards of damages
against public officials, in the absence of authoritative case
law addressing a comparable situation. See, e.g., *Hernandez
v. O'Malley*, 98 F.3d 293, 296 (7th Cir. 1996); *Feldman v. Bahn*,
12 F.3d 730, 733–34 (7th Cir. 1993); *Benson v. Allphin*, 786 F.2d
268, 276 (7th Cir. 1986). See also *Mullenix v. Luna*, 136 S. Ct.
305 (2015). We appreciate that balancing can lead to only one
outcome when all factors line up the same way; then im-

munity is unavailable. But here the district court found matters of weight on each side, while plaintiffs rely almost entirely on highly general principles, such as the rule against penalizing protected speech, that do not resolve concrete cases presenting questions in gray doctrinal areas.

Now we arrive at plaintiffs' claim that Pacetti violated the Fourth Amendment by asking Kerkman to provide information that McAuliffe was storing on the City's servers. Kerkman was then the Chief Information Officer of Comsys. By complying with Pacetti's request Kerkman may have violated his fiduciary duty of loyalty to his employer, but that does not translate to constitutional liability for Pacetti. The Fourth Amendment applies only to public actors, which Kerkman was not (yet). See *United States v. Jacobsen*, 466 U.S. 109 (1984) (private searches are not subject to the Fourth Amendment).

Plaintiffs insist that Pacetti and Kerkman entered into a conspiracy, which would make Pacetti liable for what otherwise would be a private search, but all plaintiffs seem to mean by conspiracy is that Pacetti asked Kerkman to act. Perhaps the long-term relation between Kerkman and Pacetti, which eventually led to Kerkman's hiring as the City's head of information technology, calls for treating Kerkman as an official agent; the district judge thought that more factual development was essential to decide the merits. 2017 U.S. Dist. LEXIS 70518 at *39. (That conclusion is not before us on an interlocutory appeal. *Johnson v. Jones*, 515 U.S. 304 (1995).) But for purposes of official immunity, the question is whether existing law clearly establishes that a private search is treated as a governmental search when the public and private actors are friends and potential future coworkers.

Plaintiffs do not cite any decision clearly establishing such a rule; we could not find one on our own. To the contrary, established law sets up a multifactor balancing approach that asks just how entangled the public and private actions were. See, e.g., *United States v. Crowley*, 285 F.3d 553, 558 (7th Cir. 2002). As we've already observed, a claim that relies on multifactor balancing often does not identify a clearly established rule. The district court discussed several of the applicable factors when explaining why the record is not sufficiently developed to decide whether Kerkman was acting as Pacetti's tool. That list of factors and uncertainties is why qualified immunity applies. As the Supreme Court put it in *White*:

> While this Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law. … As this Court explained decades ago, the clearly established law must be particularized to the facts of the case. Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

137 S. Ct. at 551–52 (internal citations and quotation marks omitted). By emphasizing the complexity of determining even in hindsight whether Kerkman was acting on his own or as Pacetti's agent, the district court showed that clearly established law has *not* "placed the statutory or constitutional question beyond debate."

The same can be said about the appellants' second theme: that Kerkman found the information on the City's own servers. Public employers can inspect their employees' email when that step is reasonable, see *Ontario v. Quon*, 560 U.S.

746 (2010), with consent, or when the employee lacks an expectation of privacy. The City did not act with Comsys's consent. But neither did the contract between Comsys and the City assert a privacy interest.

The contract did not regulate the City's access to data that Comsys chose to store on the City's equipment. Nor did it require Comsys to use the City's servers for storage. Unlike public employees, who must use their employer's email system (which is a big reason for requiring reasonableness or consent), Comsys and McAuliffe were free to protect their privacy by using Gmail, Yahoo!, or any of a hundred other suppliers of encrypted email services.

As an IT specialist, Comsys surely knew that it could acquire its own domain name and set up an email server on its own equipment, for the greatest possible security. Instead it chose to use the City's servers, without any contractual guarantee of privacy. This puts it in a middle ground: it did not consent to the search (expressly or by implication), but neither did it arrange privacy by contract. Clearly established law does not tell us what expectation of privacy a contractor has in such a situation, which means that the appellants are entitled to qualified immunity.

Qualified immunity protects public employees who do not violate clearly established law. Unless we accept highly general statements—such as "do not invade reasonable expectations of privacy without probable cause"—as clearly establishing the law when the existence of a reasonable privacy interest is itself debatable, these appellants prevail. We have been told by the highest authority not to take general principles as clearly establishing how novel situations must be resolved. It follows that Mayor Bosman, Administrator

Pacetti, and Manager St. Peter cannot be ordered to pay damages under 42 U.S.C. §1983. Whether they face liability under Wisconsin law is a question that we do not address.

To the extent contested on appeal, the district court's decision is reversed, and the case is remanded for further proceedings concerning other claims and other litigants.

GILBERT, *District Judge,* concurring in part and dissenting in part. I join with my colleagues on the Fourth Amendment question. The majority's holding on the First Amendment issue, however, is problematic.

Kathryne McAuliffe owns and runs Comsys: a privately-held company. And the record in this case thus far—which we must read favorably to Comsys—is disturbing. First, city administrator Frank Pacetti directed Comsys employee Merril Kerkman to steal information from Comsys and funnel it back to the city so that Pacetti could create a new internal IT department. Pacetti would then reward Kerkman for his deeds by making him the new Director of IT for the city. McAuliffe learned of this scheme when she found a confidential email printed out from her personal archives sitting on Kerkman's desk. So, like any rational citizen who realizes that they are a victim of a crime, McAuliffe notified the police. The majority recognizes the gravity of the crime, considering the opinion acknowledges that the stolen information may have included trade secrets and other confidences.

But the majority does not describe the details of what happened next. The city police department began an administrative investigation, and Pacetti's anger consumed him. Not only did Pacetti meet with the police to express his disapproval with the investigation, but he also summoned McAuliffe to his office, screamed at her, and banged his fist on the desk, threatening "wholesale changes" to the IT department—simply because McAuliffe reported a crime against her privately-held business. This left McAuliffe in tears. And after McAuliffe left Pacetti's office, she learned

that Pacetti had asked for copies of the Comsys contract and said it "needed to be re-examined."

Pacetti's rampage does not stop there. He called another meeting with the police and demanded that they give him advance notice of any arrest of Kerkman, and when the police declined, Pacetti stormed out and started another fiery confrontation with McAuliffe—**in which Pacetti threatened to terminate the Comsys contract if Kerkman got in trouble with law enforcement**. Kerkman did get in trouble: when the police investigation revealed that Kerkman likely committed computer crimes, McAuliffe filed a criminal complaint with the county sheriff's department. McAuliffe also met with a detective in the sheriff's department to inform him of Pacetti's threats against her. The majority does not address most of these facts, and even paints McAuliffe—a crime victim—as a villain of-sorts, by stating that law enforcement's seizure of the city's servers "caused bad feelings as well as considerable difficulty in getting work done."

The majority then holds that Pacetti gets qualified immunity for his actions because he did not violate any clearly established rights of the appellees. What the majority is effectively saying is that you do not have a clearly established right to report a crime against you or your privately-held business to the police. That cannot be correct. The First Amendment expressly protects "the right of the people … to petition the government for a redress of grievances." U.S. Const. amend. I. This clause has been incorporated against the states through the Fourteenth Amendment's due process clause. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). And this circuit has interpreted the clause to mean that you have "a right to petition the appro-

priate government entity [with your grievance] … .” *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). That right “[is] among the most precious of the liberties safeguarded by the Bill of Rights.” *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass’n*, 389 U.S. 217, 222 (1967).

It should be clear that the First Amendment protects your ability to report to the police that you are the victim of a crime. And although the Supreme Court “does not require a case directly on point for a right to be clearly established,” *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018), there are numerous published opinions at both the district and circuit court levels coming to the same conclusion: “[t]he reporting of a crime to police officers ‘constitutes an exercise of the First Amendment right to petition the government for the redress of grievances,’” *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (N.D. Ill. 2011) (quoting *Meyer v. Bd. of Cnty. Comm’rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007), and it is “axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of [that right].” *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194–95 (2d Cir. 1994); *Lott v. Andrews Ctr.*, 259 F.Supp.2d 564, 568, 570–71 (E.D.Tex. 2003)) (internal quotation marks omitted).

There is one final matter: the majority is correct that the Supreme Court continues to move the ball on when law is “clearly established” for a qualified immunity analysis, but the majority takes this principle too far. My colleagues rely chiefly on *Trigillo v. Snyder*, 547 F.3d 826 (7th Cir. 2008) to indicate that the right to report a crime against you or your personally-held business is not clearly established at the

moment. But *Trigillo* dealt with a public service administrator trying to ensure that the Illinois Department of Corrections was proceeding appropriately, and when the employee became more concerned with what was going on at the Department, she filed a report with the Illinois Attorney General. 547 F.3d 826–28. The employee wrote the report on a department letterhead and signed it as the "Chief of Procurement." *Id*. at 828. So it should not be a surprise that the speech in *Trigillo* fell within the scope of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), considering the speaker was undoubtedly speaking as an employee rather than as a citizen in her private capacity. That is far different from our case, where McAuliffe learned that someone was stealing trade secrets from her privately-held business and reported as much to the authorities. And the fact that McAuliffe's privately-held business had a contract with the city cannot mean that suddenly McAuliffe loses her right to report those computer crimes simply because "performance of the contract" may be at play.

Because it is clearly established that McAuliffe had a First Amendment right to report a crime against herself and her privately-held business to law enforcement, and Pacetti retaliated against her for doing so, Pacetti should not be entitled to qualified immunity on that claim. I respectfully dissent as to the majority's holding on the First Amendment question.